Patrick JAMES et al., Plaintiffs,

v.

**STOCKHAM VALVES AND FITTINGS COMPANY, a corporation, and Local No. 3036, United Steelworkers of America, AFL–CIO, Defendants.**

Civ. A. No. 70–G–178–S.

United States District Court,
N. D. Alabama, S. D.

March 19, 1975.

438

Demetrius C. Newton, Newton & Coar, Birmingham, Ala., Jack Greenberg, Norman C. Amaker, William L. Robinson, New York City, for plaintiffs.

John J. Coleman, Jr., Bradley, Arant, Rose & White, Thomas N. Crawford, Jr., Cooper, Mitch & Crawford, Birmingham, Ala., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GUIN, District Judge.

This case involves individual and class action claims of racial discrimination in certain employment practices of Stock-

ham Valves & Fittings, Inc. ("Stockham") at its Birmingham manufacturing complex. In part the claims are asserted also against United Steelworkers of America, AFL–CIO and its Local Union 3036. Plaintiffs, Patrick James, Horace Harville, and Louis Winston, are black male citizens of the United States and the State of Alabama. Messrs. James and Winston are hourly-rated production and maintenance employees of Stockham; plaintiff Harville retired from his position as a production employee in 1972. The defendant Stockham is a Delaware corporation which is engaged in business in Alabama, and, in the Southern Division of the Northern District of Alabama. The defendant unions are each labor organizations which, at all times material to this lawsuit, have represented the hourly production and maintenance employees of Stockham.

Plaintiffs bring this action individually and on behalf of a class of persons similarly situated. Jurisdiction is predicated upon Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and upon 42 U.S.C. § 1981. Claims of plaintiffs against defendant Unions are also predicated upon 29 U.S.C. § 151 et seq.

Plaintiffs contend in this case that Stockham, during the relevant period encompassed by this lawsuit has (1) maintained racially segregated employee facilities; (2) assigned black employees to "low paying menial jobs"; (3) has denied promotional, training, and transfer opportunities to black employees; and (4) has used, and is now using, testing, age, and educational requirements which discriminate against blacks.

Plaintiffs further contend that the defendant unions have failed, in violation of law, to fairly represent the black employees in the employ of Stockham.

Plaintiffs do not claim racial discrimination with regard to initial hire, apparently because during the relevant period a substantial majority of the production and maintenance employees employed by Stockham and represented by the unions, was black.

For the violations of law alleged by plaintiffs, as set out above, plaintiffs seek injunctive relief and back pay, individually, and on behalf of the class, from all defendants.

The trial of this case commenced on February 4, 1974, and, with few interruptions, continued until February 22nd. The record is voluminous. The transcript of the testimony alone constituted nearly 3000 pages. In addition there were numerous depositions, statistical presentations and other exhibits, which were extremely helpful to the Court in the consideration of this case. Each of the parties submitted comprehensive briefs and proposed findings, and conclusions of law. Thereafter, at the Court's request each of the parties was heard in oral argument on the issues involved in the case.

The Court, having fully considered the pleadings, all of the testimony, exhibits and other evidence adduced in the course of the trial, and having carefully reviewed the briefs, proposed findings of fact and conclusions of law submitted by each of the parties, and the oral arguments of counsel, and having further considered the demeanor of the witnesses who testified in this case, and having resolved the credibility issues presented by conflicts in the testimony, and having been otherwise fully advised in the premises, now makes and finds the following Findings of Fact and Conclusions of Law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure:

## FINDINGS OF FACT

### I. PRELIMINARY FINDINGS OF FACT

#### A. General Matters

1. This action has been instituted and maintained under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), and the Civil Rights Act of 1866, 42 U.S.C. §

1981 ("§ 1981"). Title VII, among other things, prohibits discrimination in employment based on race. § 1981, in relevant part, provides that all persons shall have the same right to make and enforce contracts as is enjoyed by white citizens. This action also has been instituted and maintained with respect to the union defendants under the National Labor Relations Act, 29 U.S.C. § 151 et seq., which, in relevant part, imposes a duty on a union to fairly represent its members.

2. The individual plaintiffs, Patrick James, Sr., Howard Harville and Louis Winston are black male citizens of Jefferson County, Alabama. James and Winston are presently employed by Stockham as hourly production and maintenance employees at its Birmingham, Alabama manufacturing complex and are members and officers of defendant Local 3036 of the United Steelworkers of America ("Local 3036"). Until 1972 when he retired on a medical pension, Harville was employed by Stockham as an hourly production and maintenance employee at its Birmingham, Alabama manufacturing complex and was a member and officer of Local 3036.

3. The defendant Stockham is a Delaware corporation doing business in the State of Alabama and in the Southern Division of the Northern District of Alabama, and is an "employer" within the meaning of 42 U.S.C. § 2000e(b).

4. The hourly production and maintenance employees at Stockham have been represented for collective bargaining purposes by Local 3036 at all times material to this action. The defendant Local 3036 is an unincorporated labor organization and is a local union or subdivision of defendant United Steelworkers of America. Both of these defendants are "labor organizations" within the meaning of 42 U.S.C. § 2000e(d).

5. This action has been brought as a class action under F.R.Civ.P. Rule 23.

6. The number of persons, which plaintiffs define as within their proposed class is so numerous that joinder is impractical. Further, it appears that the claims of the representative plaintiffs are typical of the claims of the purported class and there appear to be common questions of law and fact. Finally, it appears to the Court that plaintiffs James and Winston are adequate representatives of the class.

7. The evidence reflects that plaintiffs have met the requirements of F.R. Civ.P. Rule 23(a) and their allegation is that the defendants jointly have acted on grounds generally applicable to a class of black employees. The facts support a finding that this action may be maintained as a class action under F.R. Civ.P. Rule 23(b)(1) for the purposes of resolving the allegations in the plaintiffs' complaint for the following class: All black hourly production and maintenance employees of Stockham who are currently employed and all black persons who have been so employed at Stockham from July 2, 1965 to the date of trial.

8. Each of the named plaintiffs filed charges with the Equal Employment Opportunity Commission ("EEOC") on October 5, 1966, which contained specific allegations of racial discrimination against Stockham. On June 8, 1970, an amended charge of discrimination was filed by plaintiff James with the EEOC which included Local 3036 and the defendant United Steelworkers of America as parties to the previously-filed charges. Plaintiffs received notices of their right to bring suit on or about February 16, 1970, and duly filed the complaint in this action within thirty days thereof, the proper statutory period.

### B. Background Matters

#### (i) Stockham's History

1. The Stockham Pipe and Fittings Company was founded in Birmingham in 1903 and originally manufactured only simple castings and cast iron pipe fittings. The Company moved to its present location in 1918. Stockham has provided free medical and dental services to all its employees since that time, and in 1919, established a branch of the

YMCA at Company expense to serve as a center of recreational, social, and religious activities of its employees and their families. In the early 1920's, Stockham became one of the first employers in the Birmingham area to provide hospital insurance plans for its employees (and it continues to do so today). (Stockham Ex. 42)

2. Stockham began manufacturing malleable iron pipe fittings in 1923. The manufacture of bronze valves was commenced in 1935. By 1941, engineering had been completed for the manufacture of iron valves, but production was delayed by World War II until 1946. Also in 1946, a building which had been erected for the production of artillery shells during World War II was converted into a valve machining and assembly building.

3. In 1948, the name of the Company was changed to Stockham Valves and Fittings, Inc. In 1952, Stockham acquired the Wedgeplug Valve Company of New Orleans. This company was operated in New Orleans by Stockham until 1956, when the New Orleans operation was shut down and moved to the Birmingham plant.

4. Production of steel valves began in 1953. Manufacture of ductile iron valves and fittings began in 1959. Stockham began the manufacture of butterfly valves at the Birmingham plant in 1973.

5. Historically, approximately two-thirds of Stockham's employees have been black. (Stockham Ex. 42 and 51).

(ii) Stockham's Manufacturing Processes and Product Lines

1. Although Stockham has many competitors, no single competitor manufactures all six of Stockham's major product lines at one manufacturing complex.

2. Stockham has a multi-industry, multi-plant complex in Birmingham. It competes in both the pipe fittings industry and the valve industry (and in effect, is six plants in one). The Birmingham complex is, in effect, a cast iron fittings plant, a malleable iron fittings plant, a bronze valve plant, an iron valve plant, a steel valve plant and a butterfly valve plant. Stockham manufactures over 19,000 different products over a broad range of product lines. (Plaintiffs' Ex. 66)

3. The following is a list of the major domestic competitors of Stockham, the locations of their plants, and the major product lines produced at each plant:

| | | |
|---|---|---|
| Grinnell Corp. | Statesboro, Ga. | cast iron flanges and flange fittings |
| Grinnell Corp. | Cranston, R. I. | cast iron threaded fittings |
| Grinnell Corp. | Columbia, Pa. | malleable iron fittings |
| Kennedy (Grinnell Corp.) | Elmira, N.Y. | Iron valves |
| Clow Corp. | Tarrant, Ala. | cast iron flange fittings |
| Eddy Iowa Rich (Clow) | Oskaloosa, Iowa | iron valves |
| ACIPCO | Birmingham, Ala. | cast iron flange fittings |
| American Darling (ACIPCO) | Beaumont, Tex. | iron valves |
| Kuhn Bros. Co. | Dayton, Ohio | cast iron and ductile iron fittings |

| | | |
|---|---|---|
| Union Malleable Mfg. Corp. | Ashland, Ohio | malleable iron fittings |
| Dart Union Co. | Providence, R. I. | malleable iron unions |
| Stanley G. Flagg Co. | Stowe, Pa. | malleable iron and cast iron fittings |
| J. P. Ward | Blossburg, Pa. | malleable iron and cast iron fittings |
| Crane Co. | Chicago, Ill. | bronze valves, steel valves, some large iron valves, butterfly valves |
| Crane Co. | Washington, Iowa | iron valves, butterfly valves |
| Crane Co. | Indian Orchard, Mass. | iron valves, steel valves |
| Walworth Co. | So. Braintree, Mass. | bronze valves |
| Walworth Co. | Greensburg, Pa. | iron valves, steel valves, plug valves |
| Nibco | Nacogdoches, Tex. | bronze valves |
| Nibco-Scott | Blytheville, Ark. | iron valves |
| Hammond Co. | Hammond, Ind. | bronze valves |
| Fairbanks | Binghamton, N. Y. | bronze valves, iron valves |
| Lunkenheimer | Cincinnati, Ohio | bronze valves, iron valves, and steel valves |
| Lunkenheimer (Hale Valve Corp.) | Tulsa, Okla. | butterfly valves |
| Wm. Powell Co. | Cincinnati, Ohio | bronze valves, iron valves, steel valves, plug valves |
| Jenkins Bros. | Bridgeport, Conn. | bronze valves, iron valves, steel valves |
| M & H Valves (Dresser Industries) | Anniston, Ala. | iron valves |
| Milwaukee Valve Co. | Milwaukee, Wis. | bronze valves, aluminum valves, iron valves |
| Mueller Co. | Decatur, Ill. | iron valves |
| Pacific States (McWane) | Provo, Utah | iron valves |
| U. S. Pipe & Foundry | Chattanooga, Tenn. | iron valves |
| Darling Valve Co. | Williamsport, Pa. | steel valves |
| Dimco | Oklahoma City, Okla. | butterfly valves |

| | | |
|---|---|---|
| Dover Corp. | Tulsa, Okla. | butterfly valves |
| James Berry Corp. | Cambridge, Mass. | butterfly valves |
| Keystone Valve Corp. | Houston, Tex. | butterfly valves |
| Worchester Valve Co. | Worchester, Mass. | butterfly valves |
| Rockwell Mfg. Co. | Akron, Ohio | butterfly valves |
| Henry Pratt Co. | Aurora, Ill. | butterfly valves |

4. The following product lines are manufactured at Stockham's Birmingham plant:

a. Cast iron threaded fittings are manufactured in sizes ¼″ to 8″, with accurately designed chamfered threads which provide for tight joints and straight lines. These threaded fittings are primarily used in commercial construction and heating and air conditioning systems.

b. Cast iron sprinkler fittings with working water pressures of 175 pounds per square inch (psi) are manufactured in sizes from 2½″ to 8″. These fittings are primarily used in the commercial sprinkler industry.

c. Cast iron drainage fittings are manufactured in sizes from 1¼″ to 12″. These drainage fittings are designed to give an unobstructed flow by making the inside of the fittings approximately the same diameter as the inside diameter of the wrought iron pipe which it joins. The drainage fittings are used primarily in plumbing and commercial construction.

d. Cast iron flanges and flange fittings are manufactured in sizes 1½″ through 24″. These flanges and fittings can be used with any type flanged pipe.

e. Malleable iron pipe fittings capable of withstanding temperatures from −20° to 550°F. are manufactured. Malleable iron is a tough, highly ductile iron capable of withstanding pipeline stresses from expansion, contraction, and shock. Malleable iron pipe fittings are used primarily in commercial, institutional and industrial construction.

f. Malleable iron threaded fittings are manufactured in sizes ⅛″ to 12″.

g. Malleable iron unions and union fittings are manufactured in both flanged and threaded types. The threaded types are made in sizes from ¼″ to 4″; the flanged types are made in sizes 1″ to 10″. Unions are produced with brass seats, gasket seats, or with integral all-iron seats. Union fittings combine the functions of a fitting and union in one compact assembly. Brass seats are forced into their grooves under tremendous rolling pressure forming a leak-proof joint. All parts are machined and threaded.

h. Malleable ball pattern railing fittings are manufactured in sizes from ½″ to 2″.

i. Ductile iron pipe fittings are manufactured in threaded and flanged types. The threaded types are produced in sizes from ½″ to 6″; the flanged types are produced in sizes from 1½″ to 6″.

j. Bronze globe, angle, and check valves are made in 125, 150, 200, 300 and 350 psi ratings in sizes ⅛″ to 4″. The primary markets for these valves are commercial and institutional construction, the chemical industry, and commercial ship building, as well as all general industry and utilities. Service recommendations are for steam, water, oil, gas, or other media up to 550°F. Actual in-line pressures may range up to 1000 psi.

k. Iron gate, globe, angle, and swing check valves are manufactured in sizes ¼″ to 36″. Primary markets for these valves are commercial and institutional construction, the chemical industry, iron and steel industries, and gas distribution. Iron valves are recommended for media to maximum pressures of 500 psi and maximum temperatures of 450°F.

l. Steel gate, globe, angle, and swing check valves are manufactured in sizes 2″ to 30″. Primary markets for these valves are power generators, petroleum refining, and the petrochemical and chemical industries. Twelve cast steel alloys are offered as basic valve materials for services to a maximum pressure of 1440 psi, and maximum temperatures of 1500°F. These materials require magnetic particle testing and sometimes radiography. Careful welding of casting repairs requires stress relieving. Heat treatment of various raw materials is also required.

m. Butterfly valves with iron or ductile iron bodies are manufactured in wafer or lug-wafer type, with wide choice of stem, disc, and liner material for pressures up to 150 psi in sizes 2″ to 12″. Primary markets for these valves are commercial, institutional, and industrial construction.

n. Wedgeplug non-lubricated plug valves are manufactured in sizes ¾″ to 20″. These valves have a patented mechanical lifting device which lifts, rotates, and re-seats the plug. Primary markets for these valves are the petroleum refining and petro-chemical and chemical industries. These valves are used in catalytic cracking and coking operations, and in distribution service in various petroleum or chemical product lines. Service pressures range up to 2160 psi with temperatures up to 1500°F.

o. Slurry valves are manufactured in sizes 2″ to 24″. Special slurry valves are used by aluminum mines and refineries in handling coarse and fine slurries, red mud, and caustic aluminum liquor. These valves are built for rugged heavy-duty service with rigidity and strength to withstand severe corrosive, erosive, and scaling conditions. They are sometimes lined with special alloys such as nickel for corrosion resistance. They are used in services up to 1000°F. and pressures up to 1440 psi.

p. Ductile iron gate, globe, angle, and check valves are manufactured in sizes 2″ to 24″. Primary markets for these valves are power generation, petroleum refining, and the petro-chemical and chemical industries. Service pressures are up to 720 psi, with service temperatures up to 650°F.

5. There are nationally recognized standards of product quality for the valves and fittings industries.

6. Each product in the product lines manufactured by Stockham meets or exceeds these nationally recognized standards of product quality.

7. Component parts for valve products in the valve products lines at Stockham are machined to extremely close tolerances and specifications so that such valve products may be safely and efficiently used for the purposes for which they are designed and manufactured.

8. Tapping operations upon pipe fittings in the pipe fittings product lines of Stockham are performed to extremely close tolerances and specifications so that such pipe fittings may be safely and efficiently used for the purpose for which they are designed and manufactured.

9. The following is a brief survey of the manufacturing processes involved in each of the product lines at Stockham:

(a) Grey iron castings for fittings and valve bodies are made in the Grey Iron Foundry Department. Molds are prepared by forming the impression of the molding pattern in specially treated sand. Usually a core made of a specially treated sand in the Main Core Room Department is inserted in the center of the

mold to form the center opening in the casting, whether it be a fitting or a valve body. Iron from the Yard is loaded into a cupola, melted and poured into the prepared mold. After cooling, the castings are taken from the mold, excess materials on the casting are cut off, and the castings are ground and cleaned, and then inspected by the Foundry Inspection and Galvanizing Inspection Department. Valve body castings go to the Valve Machining and Assembly Department; fittings and unions castings go to the Tapping Room and Union Assembly Department, except those to be galvanized go first to the Galvanizing Department.

(b) Malleable iron castings for fittings are made in the Malleable Foundry Department. A mold is made by using a pattern and specially treated sand; and usually a core, made in the Main Core Room Department, is inserted in the center of the mold. Molten metal is prepared in a cupola and poured into the finished molds. The castings are then heat treated to give them their malleable properties. The castings are then ground, sheared, and inspected by the Foundry Inspection and Galvanizing Inspection Department. Fittings and unions castings are sent to the Tapping Room and Union Assembly Department, except those to be galvanized go first to the Galvanizing Department.

(c) The Brass Foundry Department principally produces bronze body castings for bronze valves, but it also produces castings, such as brass seat rings, for the other departments. The castings are made by forming a sand mold around a pattern, with a sand core from the Brass Core Room Department inserted in the center. Brass of a specific alloy content is melted in a furnace and poured into the prepared mold. Brass valve body castings are cleaned and inspected by the Foundry Inspection and Galvanizing Inspection Department. Other bronze castings are inspected and sent to the departments where they will be used.

(d) In the Galvanizing Department, fittings and unions are dipped in acid solutions for cleaning. They are then submerged in molten zinc and quenched in water, leaving a coating of rust-proof zinc on the fittings and unions. These fittings and unions then go to the Tapping Room and Union Assembly Department.

(e) In the Tapping Room and Union Assembly Department, threaded fittings have precision chamfered threads machined into them. Flanged fittings are drilled and faced. Other finishing operations are carried out on both types of fittings. The three-piece unions have precision seat rings inserted, are otherwise finished, and are assembled by joining the head to the tail with the nut.

(f) These fittings and unions then pass through the Final Inspection and Union Inspection Department. After inspection, they go to the Shipping Room Department, where they are warehoused.

(g) The Valve Machining and Assembly Department produces an array of sizes and types of valves. Iron valve body castings from the Grey Iron Foundry Department, ductile iron body castings from the Grey Iron Foundry Department, and bronze valve body castings from the Bronze Foundry Department, along with the other valve parts, are precision machined and assembled.

(h) The assembled valves go to the Valve Finishing Inspection Department for inspection and testing. After inspection, the finished valves go to the Shipping Room Department for storage.

(i) The Shipping Room Department warehouses the finished products and fills and ships customer orders.

(j) As the dispatchers decide that a particular item is to be made somewhere in the plant, the Dispatching Department employees take the proper unfinished items to the particular area of the plant for completion of the manufacturing process. For example, the Dispatching Department employees take rough castings to machine operators in the

Valve Machining and Assembly Department for finishing and take patterns from the pattern storage area to the molders in the foundries as changes are made.

(k) The Pattern Shop Department makes and repairs patterns which are used to make the impressions in the molds in the foundries.

(l) The Electrical Shop Department does maintenance on all electrical equipment, building wiring, and does new electrical construction on both buildings and equipment.

(m) The Valve Tool Room Department sharpens and maintains the tooling used in the machining of valve parts.

(n) The Foundry Repairs Department is responsible for mechanical maintenance of all equipment in the foundries and for installation of new equipment in the foundries.

(o) The Machine Shop Department maintains plant equipment and performs the types of work common to a machine shop. ·

(p) The Construction Department keeps the plant buildings in good repair and does construction work on new buildings.

(iii) Working Conditions at Stockham

1. The foundry industry by nature is somewhat hot and dusty but the working conditions at Stockham's foundries are superior to the working conditions of the average foundry in the southeastern part of the United States.

2. The skilled production jobs in foundries include the jobs of core making and molding machine operator. Although these jobs were historically "white jobs" in most places in the southeastern United States, black employees have historically held these more desirable production jobs in Stockham's foundries.

3. Black employees at Stockham are employed in jobs that historically have been held almost exclusively by white employees in the industry. (Stockham Ex. 74)

4. Since 1965, the Birmingham office of the Alabama State Employment Service has had approximately 10,000 job applications per year and has serviced approximately 20% of the unemployed persons in Birmingham (60% of that 20% were black). At no time since 1965 has there been a substantial number (between 5 and 10) of black applicants for jobs as machinists, blacksmiths, electricians, carpenters or pattern makers.

5. Stockham received the Birmingham Urban League's Business Hiring Award for 1973 for hiring more minority referrals from the Birmingham Urban League than any other employer.

6. The working conditions of plaintiffs or the class or classes they represent are not hotter, dustier, or dirtier than the working conditions of white employees at Stockham.

7. The jobs of plaintiffs or the class or classes they represent are generally no less desirable with reference to working conditions than the jobs of white employees at Stockham.

(iv) Stockham's Incentive
Pay System

1. The incentive pay system provides extra compensation for the good worker without regard to race and does not discriminate in its operation as a method of determining pay, against plaintiffs, or the class or classes they represent in this action. (Stockham Ex. 51A and B)

2. The incentive pay system divides incentive jobs into direct incentive compensation jobs and indirect incentive compensation jobs. (Stockham Ex. 51A and B)

3. The direct incentive pay system applies to those jobs which are directly concerned with production. (Stockham Ex. 51A and B)

4. The indirect incentive pay system applies to those jobs which support production. (Stockham Ex. 51A and B)

5. The incentive pay system operates solely with reference to jobs, not the race of the employees holding any particular job. (Stockham Ex. 51A and B)

6. The incentive system at Stockham is based upon the Bedaux incentive system which is widely used throughout United States industry.

7. An incentive worker receives an allowance to compensate for: (1) scrapped goods beyond his control; (2) fatigue from heat and other environmental circumstances; (3) auxiliary work; and, (4) personal time.

8. The direct incentive worker is assured the equivalent of a 60 unit hour at his base pay rate.

9. Before an incentive value can be established for a direct incentive job, the method of the job must be standardized. For a job to be subject to standardization it must be repetitive and capable of being performed in a uniform manner or method. Once the method is established, the job is studied and incentive values established.

10. The indirect incentive worker is assured of not less than 65 unit hours, an assured rate equivalent to slightly higher than midway through his pay classification.

11. Some production jobs are not on the incentive system because they are so new the method has not been standardized or because incentive applications are not practical for that particular job. All production jobs capable of being measured and standardized are placed on the incentive system as soon as possible.

12. Maintenance work is not repetitive or uniform and therefore maintenance jobs are not on the incentive system.

13. A direct incentive worker's pay averages approximately 25% over his incentive base pay.

14. Plaintiffs' statistics substantiate the testimony that direct incentive workers actual pay is approximately 25% over base rate. The unadjusted average hourly rate for white incentive workers is $3.15 and for black incentive workers is $2.98. The unadjusted average actual earnings per hour for white incentive workers is $4.09 and for black incentive workers is $3.91. (Plaintiffs' Ex. 97)

15. As of September 1, 1973, there were 178 white and 869 black incentive employees at Stockham. (Plaintiffs' Ex. 79)

16. The production jobs in the bargaining unit which are under the incentive system of pay are in job classes 2 through 9. (Stockham Ex. 51A and B)

17. The incentive pay system does not discriminate against plaintiffs or the class or classes they represent as a conceptual method of determining pay. (Stockham Ex. 51A and B)

18. The indirect and direct systems of incentive compensation do not discriminate against plaintiffs, or the class or classes they represent.

19. The method by which it is determined that a job qualifies for indirect or direct incentive compensation is not discriminatory against plaintiffs, or the class or classes they represent.

(v) Stockham's Merit Rating System

1. For each job classification at Stockham there are different levels or gradations of pay for non-incentive employees. (Stockham Ex. 51A and B)

2. A job's classification is determined by evaluating the job and describing it on a point value basis. (Plaintiffs' Ex. 85)

3. To advance from one gradation of pay to the next, beginning with the starting rate for his job class, a non-incentive employee must obtain a predetermined merit score under the merit rating system. (Stockham Ex. 51A and B)

4. The merit rating system as it presently operates at Stockham has been in existence since prior to 1950.

5. For non-incentive workers, a higher merit score is required for advancement to each successive gradation of pay

within a job class. (Stockham Ex. 51A and B)

6. A new employee is rated at the end of his first three (3) months on the job, at the end of his first six (6) months on the job, and thereafter at the end of each six (6) month period of employment. (Stockham Ex. 51A and B)

7. The performance of all hourly rated employees, both incentive and non-incentive, is rated. (Stockham Ex. 51A and B)

8. The merit score received by a non-incentive employee is used to determine whether he will be given an increase in pay within his job classification. The merit score received by an incentive employee has no effect on his pay. (Stockham Ex. 51A and B)

9. The merit scores received by both incentive and non-incentive employees become part of their personnel records and constitute a record of their performance on the job for a given six (6) month period. (Stockham Ex. 51A and B)

10. The foreman under whose direct and immediate supervision an employee works is the individual who performs the merit rating. (Stockham Ex. 51A and B)

11. The rating is based on the firsthand observation by the foreman of the employee's performance on the job for the prior six (6) months. (Stockham Ex. 51A and B)

12. The foreman performing the merit rating is required to complete form "PE–1" entitled "Personnel Rating" which entails evaluation of the seven (7) following factors: quantity, quality, job or trade knowledge, ability to learn, cooperation, dependability and industry, and attendance. (Stockham Ex. 51A and B)

13. For each of the seven factors listed above, the rater must place a check mark in the block on the merit rating form indicating whether the rated employee's performance over the prior six (6) months has been unsatis-

factory, poor, average, superior or exceptional. (Stockham Ex. 51A and B)

14. The terms "unsatisfactory," "poor," "average," "superior" and "exceptional" are defined in written terms on the merit rating form. (Stockham Ex. 51A and B)

15. All merit ratings performed by a foreman are revised and approved by the foreman's immediate superintendent. (Stockham Ex. 51A and B)

16. The completed and approved merit rating form is sent to the Industrial Relations Department where it is graded by Mr. Willard Bagwell, the wage and salary administrator, or someone under his direction. (Stockham Ex. 51A and B) The foreman who evaluated the employee and the superintendent approving the rating do not score the rating. (Plaintiffs' Ex. 85)

17. The merit rating form is graded according to a predetermined numerical table which is applicable to all hourly employees without regard to race. The rating foreman is unaware of the point values assigned to each category. (Stockham Ex. 51A and B)

18. The merit rating system is not used to reduce an employee from one gradation of pay to another. (Stockham Ex. 51A and B)

19. Since June 10, 1970, each foreman is required to review the merit rating with each employee he rated at least once a year pursuant to the collective bargaining agreement. (Stockham Ex. 23 and 24)

20. Since June 10, 1970, an employee who did not receive a pay increase because of his merit rating could ask for a meeting with his foreman, superintendent and committeeman to discuss his failure to qualify for an increase. (Stockham Ex. 23 and 24)

21. Since June 10, 1964, employees have been urged to discuss their merit ratings with their foremen under the terms of the applicable labor contract. (Stockham Ex. 51A and B)

22. An employee gets a merit increase if he has a sufficiently high score at least once a year whether his supervisor recommends him for an increase or not. (Plaintiffs' Ex. 85)

23. Only infrequently has a supervisor not recommended an employee for a merit increase if the employee scored high enough to receive an increase on his merit rating. (Plaintiffs' Ex. 85)

24. Stockham's merit rating system does not discriminate against and has not been used to discriminate against plaintiffs or the class or classes plaintiffs represent.

### C. Stockham's Departmental Seniority System

1. The preponderance of the evidence reflects that the objective of the Stockham seniority system is to place the best qualified individual on the job in the quickest, most efficient and safest manner possible.

2. Stockham has operated on a departmental basis since at least 1940. The departmental operation was formalized into a seniority system by agreement with Local 3036 in 1949. The departmental operation was practiced by Stockham both prior to and subsequent to unionization, and has continued to be accepted by the unions since that time.

3. The defendant United Steelworkers, through the defendant Local 3036, has been the bargaining representative for hourly workers since 1944, and has represented Stockham's production and maintenance workers at all times material to this action. One of the functions of defendant Local 3036 is the representation of Stockham's production and maintenance employees in furtherance of their contract demands. The departmental seniority system has been operated and maintained pursuant to the collective bargaining agreements between Stockham and Local 3036, which have at all times material to this action provided for departmental seniority.

4. The defendant Local 3036 has participated in the collective bargaining negotiations, and the Local 3036 membership ratifies every labor contract between Stockham and the Union by a majority vote before it becomes effective. Between 700 and 1,000 Local 3036 members voted at the two meetings in 1970 and 1973 held to ratify the labor contracts, and the percentage of members at each ratification meeting was between 65% and 70% black employees.

5. Since World War II, the majority of Stockham's employees and the union's members has been black. The majority of the members of the Local 3036 grievance committee and Local 3036's officers have been black employees of Stockham since at least 1967. Plaintiffs James and Winston have been officers in Local 3036 in recent years and they participated in labor contract negotiations. In addition, the defendant Steelworkers staff representative, who aids Local 3036 in contract negotiations is black.

6. While other forms of seniority may have been discussed from time to time, the basic (*i. e.*, written) bargaining proposals submitted to Stockham by the Unions have never requested a change from the existing departmental seniority system and have instead reflected an intention on the part of the Unions to preserve the present seniority system.

7. Under the departmental seniority system employed by Stockham and the Unions, an employee desiring to transfer to a job in his home department or in any other department may apply to do so by filing a timely application for that job. There is no job progression at Stockham, so an employee may apply for any job for which he feels he is qualified (including clerical, supervisory, and apprentice jobs). When a job vacancy occurs, all pending timely applications for such job are reviewed. Consideration is given to the skill, knowledge, training, efficiency, and physical fitness of the timely applicants. Where two or more applicants have developed these qualities to the same degree, the applicant with the greatest seniority in the

department where the vacancy has occurred is given preference. If an employee changes departments, he has eighteen months to decide whether he wishes to remain in his new department or return to his old department. If he elects to remain in his new department, for layoff protection the employee retains his seniority in his old department until he has achieved equal seniority in his new department. If, during this period of time, he is laid off in his new department, he may return to his old department with the accumulated seniority of both his old and new departments. If, after the eighteen-month trial period, he elects to return to his old department, he retains his seniority in his old department, with time spent in the new department added to that seniority.

8. The Stockham seniority system is predicated in substantial part upon the fact that Stockham's Birmingham operation is a "multi-plant" facility, unique in the industries in which it competes, and in part upon considerations of safety and efficiency.

9. There is no evidence of any acceptable alternative to the departmental seniority system employed by Stockham.

10. Stockham's departmental seniority system neither locks employees into the departments to which they were originally assigned nor deters inter-departmental transfers by employees.

11. Plaintiffs failed to show a single instance of a black employee who desired to move between departments but elected to remain in his present job for fear of losing his accumulated seniority.

12. Stockham employees, both black and white, transfer from department to department; the number of applications for such transfers indicates that employees are not inhibited from making such transfers by the operation of the seniority system or by any fear of losing seniority.

13. Since there is no job progression (or lines of progression) at Stockham, an employee can apply for any job for which he feels he is qualified. Further-more, there are no entry-level jobs in the departments through which employees are required to move before obtaining other jobs. An employee at Stockham can transfer directly to any job vacancy within a seniority unit for which he is qualified.

14. At all relevant times black employees have accounted for the large majority of all inter-departmental transfers. Black employees accounted for a low of 59.4% in 1965 and a high of 89.-7% in 1968 of all inter-departmental transfers.

15. Where, among applicants for a job vacancy, each has about the same degree of skill, knowledge, training, efficiency, and physical fitness, as evaluated by his foreman, superintendent, and manager, then the applicant with the longest service in the department is given preference for the position. (Plaintiffs' Ex. 24) In filling job vacancies, seniority is not the sole, or indeed primary determinant of which employee is selected.

16. The timely application procedure at Stockham allows an employee to apply for any job in the plant regardless of whether a vacancy currently exists and to be considered for the job when a vacancy occurs. (Stockham Ex. 51A and B) An employee may file applications for any number of jobs and maintain any number of applications simultaneously. There is no need for the employee to continually check job postings.

17. From 1965 through 1973, 609 black employees and 590 white employees have filed timely applications. (DX.62) 26.6% of the timely applications filed by black employees and 31% of those filed by white employees have been granted. (Stockham Ex. 78)

18. Through the timely application procedure, black employees are not dependent on other employees for notice of job openings and are not dependent upon their supervisors for promotion and transfer consideration.

19. An employee moving to a new job may attain minimum competence to

perform the job after some period of time, but he may not become a proficient worker in that job for a period of years. If such an employee were allowed to remain on the job in the event of a layoff while his fellow employee, who had many more years on that particular job but fewer total years with Stockham, was laid off, the efficiency of the manufacturing process would be substantially reduced. An inefficient seniority system could ultimately result in reduced employment at the Stockham facility.

20. A preponderance of the evidence reflects that if the seniority system at Stockham were expanded beyond a departmental concept, the resulting inefficiencies could affect Stockham's competitive position and result in discontinuance of some product lines and consequently, a reduction in existing employment of Stockham employees.

21. Stockham employees who have worked in a given department are more familiar with the operations of the department and any safety hazards involved in working in that department. They are able to assume the duties of a job in that department quicker, with less expense, and with greater safety, than employees from outside the department who lack such familiarity.

22. In putting the best qualified man on the job, Stockham must consider not only the safety of the worker, his fellow workers and the protection and maintenance of expensive manufacturing equipment, but also the maintenance of high standards of product quality in order to insure the safety of the ultimate users of the products.

23. There are equal earnings opportunities in virtually all of the seniority units at Stockham with no department or departments monopolizing the higher paying jobs. For instance in the malleable seniority unit, six of the top 10 wage earners in 1972 were black with one black in a class 3 incentive job earning $10,129.84. Likewise, in the grey iron foundry unit, 9 of the top 10 wage earners in 1972 were black with one black, a class 6 incentive worker, earning $11,250.85. In the brass foundry seniority unit, all of the top ten wage earners in 1972 were black with one black earning $9,375.99. These departments should be compared with the (predominantly white) pattern shop seniority unit, where in 1972, the top 10 wage earners were all white class 13 workers but the highest white earned only $8,866.82. In the valve machining and assembly seniority unit in 1972, the top wage earner was white but earned only $10,217.24. In the valve tool room seniority unit, the top wage earner, in 1972, a white class 13 worker earned only $8,761.60. (Stockham Ex. 87) A thorough analysis of the top wage earners in each seniority unit shows that for the most part the economic opportunities in all seniority units are essentially equal. In ten of the twenty-two seniority units listed in plaintiffs' exhibit 11, the unadjusted black gross earnings *exceeded* unadjusted white gross earnings and in 9 of the 22 seniority departments the unadjusted black hourly earnings *exceeded* unadjusted white hourly earnings. There is no reason to believe that four black workers such as Willie Rooks, Melvin Thomas, Simon Irby and Douglas McCoy, all of whom made more than $9,500 in 1972, would desire to move or transfer from the malleable foundry to the pattern shop, where the top white wage earner, a class 13 worker, made only $8,866.82 in 1972, or to the foundry repairs unit where the top earner made less than $9,500. (Stockham Ex. 87; Plaintiffs' Ex. 16) The relatively high earning opportunities in the foundries (malleable, brass, and grey iron) suggest that the high number of blacks in these departments results from voluntary choices by these employees to work in those departments where the most money can be made.

24. The evidence introduced by plaintiffs failed to establish that there are demonstrably superior working conditions in certain departments, and this

Court finds that the working conditions in various departments at Stockham are generally the same.

25. At no time has Stockham maintained a policy prohibiting transfers between seniority units and there have never been any restrictions on the number of interdepartmental transfers.

26. The record evidence does not support the conclusion that at any relevant time, Stockham's departmental seniority system has discriminated against plaintiffs or the class or classes they represent.

27. The record evidence does not support the conclusion that Stockham's present modified departmental seniority system discriminates against plaintiffs or the class or classes they represent.

28. The record evidence does not support the conclusion that Stockham's departmental seniority system locks black employees into particular jobs, pay categories, or departments.

29. The record evidence does not support the conclusion that black employees remain in certain departments because they fear losing seniority.

D. Initial Assignment at Stockham

1. Approximately 68% of Stockham's work force is black and the great majority of the membership in Local 3036 is black.

2. The representation of blacks among Stockham production and maintenance employees exceeds the representation of blacks among federal blue collar workers by 89.2% to 185.5% within educational cells. (Stockham Ex. 17)

3. The representation of blacks among blue collar employees of the federal government is 23.7% and among production and maintenance employees at Stockham is 68%. (Stockham Ex. 17)

4. Approximately 11% of the national work force is black and approximately 23.7% (or twice as many) of the federal blue collar workers are black. Approximately 68% (or almost 3 times the local labor market) of Stockham's employees are black.

5. The fact that Stockham's representation of blacks to whites exceeds that of the Birmingham SMSA by 177.-6% indicates that job opportunities for blacks at Stockham are superior in relation to the Birmingham labor market as a whole.

6. As pointed out in the findings relative to the seniority system, the seniority units at Stockham were established no later than 1950 and were developed because of functional, nonracial reasons. Black employees work in each seniority department at Stockham. (Plaintiffs' Ex. 9 and 10)

7. The departments at Stockham cannot be analyzed in abstract terms; it is necessary to consider the number of jobs in any department; the type of work performed therein; and, the skills and qualifications required for successful job performance.

8. Stockham's black employees work in jobs often filled by whites at other employers, and black employees have the most desirable production jobs in Stockham's foundries. (Stockham Ex. 74) The more skilled production jobs in foundries in the South and throughout the nation are the core-making and molding machine operator jobs which historically were considered to be "white jobs" in the foundry industry. Blacks have historically held these jobs at Stockham, and this is one of the explanations for the large number of blacks in the foundry departments. Historically, blacks came to Stockham and requested jobs as core-makers and molding machine operators—jobs they knew to be available to them only at Stockham. Another factor is that the foundry departments offer some of the highest earnings opportunities at Stockham.

9. Since 1965, the Birmingham office of the Alabama State Employment Service has had approximately 10,000 job applications per year and has serviced approximately 20% of the unemployed persons in Birmingham (60% of that 20%

were black). At no time since 1965 has there been a substantial number (*i. e.* between 5 and 10) of black applicants for jobs as machinists, blacksmiths, electricians, carpenters or pattern makers.

10. Black employees fill 10 (5%) of approximately 200 craft jobs at Stockham. Five percent is not an underrepresentation of blacks in craft jobs compared to the local and national labor markets.

11. There is no black employee of Stockham who has completed an apprentice program at Stockham or elsewhere which qualifies him as a millwright, machinist, pattern maker, welder, carpenter, electrician, box floor molder, auto truck mechanic, blacksmith or heat treater who is not working in such capacity for Stockham.

12. There is no black employee holding a certificate of eligibility to work as a journeyman millwright, machinist, pattern maker, welder, carpenter, electrician, box floor molder, auto truck mechanic, blacksmith or heat treater who is not working in such capacity for Stockham.

13. Of the 626 employees (251 white and 375 black) employed as of January 1, 1974, who had sought a specific job when applying to Stockham for employment, 61% of the white employees and 53% of the black employees were placed in the job of their own selection. (Stockham Ex. 58)

14. Stockham has provided jobs for many black employees, who, but for their Stockham jobs, would be among the hard-core unemployed. (Stockham Ex. 74)

15. Stockham received the Birmingham Urban League's Business Hiring Award for 1973, for hiring more minority referrals from the Birmingham Urban League than any other employer in the greater Birmingham area.

16. This Court finds that Stockham has at no time made initial job assignments (either to departments or to specific jobs) on the basis of an employee's race.

### E. Promotions and Transfers at Stockham

1. The evidence shows that the objective of the transfer and promotion system at Stockham is to get the best qualified individual on the job in the quickest, safest manner possible.

2. The classification of jobs at Stockham into job classes 2 through 13 is a system for rating the complexity of a job or the skills required to perform the job. The complexity and required skills increase as the job class number increases.

3. The job classification system as established and maintained at Stockham does not discriminate against any person on the basis of his race. In the early 1950's for the most part, each of the jobs in the plant was studied and evaluated in terms of job functions. The job classification assigned to any job indicated only the relative skills, abilities and prior training necessary for a worker to perform adequately the particular task.

4. The job classification assigned to any job does not provide any indication of the desirability of the job in terms of earnings potential or actual working conditions. A comparison which contrasts one employee in job class 4 with another in job class 10 is an abstract comparison; it offers no meaningful comparison of the terms and conditions of the two individuals' employment.

5. The evidence in this case clearly establishes that the job class held by a particular individual normally has very little to do with the amount of his actual earnings because of the incentive pay system at Stockham. Incentive workers typically make approximately 25% more than their base rate of pay, and of the 75 persons in the production and maintenance unit making more than $9,000 per

year in 1972, 40 of those employees were in job classes 9 and below.

6. In connection with varying work conditions associated with different jobs at Stockham, plaintiffs failed to prove that there is any correlation between job classification and the quality of work conditions. Allegations of discrimination in work conditions are not susceptible to proof by statistics and plaintiffs had equal access to the type of information required to prove a variance in work conditions. The evidence showed, however, that many of the jobs carrying classifications 10 through 13 involve working conditions which were equal to or worse than some of the jobs which plaintiffs themselves labeled as "hot, dirty and dusty."

7. Two jobs on which plaintiffs spent exhaustive time in an effort to prove them to be "white" jobs were box floor molder (large), a class 12 job, and crane operator, a class 11 job. Plaintiffs failed to establish that either of these jobs possessed more desirable attributes in terms of either compensation or working conditions. The following table, derived from plaintiffs' exhibit 16 which shows the relative earnings of employees within the seniority units, demonstrates that the economic advantages of these jobs are no higher than those jobs held by many blacks.

| NAME | RACE | JOB TITLE | SENIORITY UNIT | 1972 EARNINGS | A * | B ** |
|---|---|---|---|---|---|---|
| Ronald L. Parsons | W | Crane Operator | Grey Iron | $8387.12 | 8th | 7 |
| Ernest Kilpatrick | W | Box Floor Molder | Grey Iron | $8170.02 | 12th | 10 |
| Ernest Alverson | W | Crane Operator | Grey Iron | $7833.24 | 18th | 15 |
| Phillip Naylor | W | Crane Operator | Grey Iron | $6937.14 | 86th | 81 |
| William P. Williams | W | Crane Operator | Malleable | $8338.99 | 25th | 20 |
| Ralph D. Mowery | W | Crane Operator | Malleable | $8229.57 | 27th | 21 |

A * —Rank Within Department
B **—Number of Blacks Within Department Earning More

8. Plaintiffs' failure to prove any correlation between job class and desirable working conditions, coupled with the extensive evidence showing no correlation between job class and actual earnings, demonstrates that no conclusion of racial discrimination can be drawn from the mere fact that the "average" job class for blacks is lower than the "average" for whites.

9. Black production and maintenance employees accounted for a large majority of the inter-departmental transfers between 1965 and 1972. (Stockham Ex. 61)

10. There is no black employee of Stockham who has completed an apprentice program at Stockham or elsewhere which qualifies him as a millwright, machinist, pattern maker, welder, carpenter, electrician, box floor molder, auto truck mechanic, blacksmith or heat treater who is not working in such capacity for Stockham.

11. There is no black employee holding a certificate of eligibility to work as

a journeymen millwright, machinist, pattern maker, welder, carpenter, electrician, box floor molder, auto truck mechanic, blacksmith or heat treater who is not working in such capacity for Stockham.

12. Blacks are employed in each seniority department at Stockham. (Plaintiffs' Ex. 9 and 10)

13. Whenever a vacancy occurs, jobs are filled in accordance with the provisions of the labor contract. (Stockham Ex. 51A and B)

14. The factors in determining whether an individual is qualified are set forth in paragraph 1 of Section XIII of the labor contract and consideration is given to the "skill, knowledge, training, efficiency, and physical fitness" of the employees being considered. (Stockham Ex. 51A and B; Plaintiffs' Ex. 24)

15. Where among the employees filing timely applications within the department, each has about the same degree of skill, knowledge, training, efficiency and physical fitness, the employee having the longest service in the department is given preference for job vacancies. (Stockham Ex. 51A and B)

16. A job need not be vacant before an interested employee can file a timely application for the job. (Stockham Ex. 51A and B)

17. The formalized timely application procedure was made a part of the 1970 collective bargaining agreement applicable to the production and maintenance employees of Stockham. (Stockham Ex. 51A and B)

18. The timely application procedure permits an employee to apply for transfer to another job in the plant before a vacancy in the job applied for actually occurs. (Stockham Ex. 51A and B)

19. The timely application procedure permits an employee to maintain simultaneously several current applications for transfer to other jobs. (Stockham Ex. 51A and B)

20. The timely application procedure permits an employee to apply for transfer to another job he desires without the necessity of his regularly checking current job postings to ascertain that there is a vacancy in the job he desires. (Stockham Ex. 51A and B)

21. A timely application is written up for an individual by his foreman at his request and the application is forwarded to the superintendent who retains a copy and sends a copy to the personnel department. A copy is also given to the employee's union representative.

22. Any employee at Stockham can file a timely application for any job at Stockham, although the labor contract relates to hourly jobs only.

23. The timely application procedure was initially formalized in 1965 and became a part of the collective bargaining agreement in 1970.

24. From 1965 through 1973, a total of 1,199 timely applications were filed. (609 by blacks and 590 by whites.) (Stockham Ex. 62)

25. 25.62% of all timely applications filed by black employees and 31.02% of all timely applications filed by white employees since 1965 have been granted.

26. Stockham proposed in the 1973 labor negotiations that supervisors notify in writing the committeeman or in his absence the senior qualified man in a seniority group, of all new jobs or expected vacancies for which timely applications have been filed. (Stockham Ex. 80)

27. According to the current labor agreement, a worker transferring from one department to another at the direction of management has 18 months to decide whether he wants to remain in the new department. If he elects to remain in the new department he will retain his seniority in his home department until he has been in the new department as long as he was in the old department. (Stockham Ex. 80; Plaintiffs' Ex. 24)

28. An employee moving to a new job may attain minimum competence after some period of time but may not

become a proficient worker in that job for a period of years depending upon the complexity of the job.

29. Stockham introduced extensive testimony regarding the qualifications needed by individuals to perform the critical jobs—the craft, highly skilled and skilled jobs—safely and efficiently, as reflected in the findings of fact, *infra*. The critical jobs are for the most part those jobs in class 10 and above. This evidence was in the form of objective criteria applied to all workers alike. The evidence stands uncontradicted by plaintiffs and when confronted directly, plaintiffs were unable to show a single instance of a qualified black who sought one of these jobs and was rejected while whites of equal or inferior qualifications obtained the job.

30. The relatively small number of blacks in certain high skilled and craft jobs at Stockham is due not to the discriminatory practices of the defendant, but due instead to the absence of qualified black employees.

F. Job Qualifications Essential For Certain Skilled, Highly Skilled and Craft Jobs—The Critical Jobs

(1) Craft and Highly Skilled Maintenance Jobs

1. The jobs of Millwright First Class, Electrician First Class, Carpenter, Patternmaker, Blacksmith, Welder Specialist and Machinist First Class are critical jobs. They are highly skilled, journeyman trade maintenance jobs requiring the completion of an apprenticeship or equivalent job training. Each of these jobs requires the maintenance or operation of expensive equipment and affects the safety of the journeyman and other employees who work around him, or follow behind him, as well.

2. The jobs of Millwright, Repairman, Electrician Second Class, Machinist Second Class, Electric Acetylene Repair Welding and Auto-Truck Mechanic are critical jobs and are highly skilled maintenance jobs requiring considerable training involving the maintenance or operation of expensive equipment, and affecting the safety of the particular tradesman and other employees working with him, or following behind him, as well.

3. There is no formal or automatic line of progression from Repairman to Millwright to Millwright 1st Class, nor from Electrician 2nd Class to Electrician 1st Class, nor from Machinist 2nd Class to Machinist 1st Class.

4. The jobs of Machinist 2nd Class, Electrician 2nd Class, Repairman, and Millwright require significantly more supervision than a journeyman, or 1st Class tradesman, in those trades. They also require some degree of attention from the journeymen in their field of work. Thus, some time and effort of the journeymen is taken up in providing instruction, training, and direction for others working below him in his trade.

5. The aptitude of a prospective applicant for a highly skilled or craft maintenance job may be indicated by the jobs which the applicant has held previously and by his hobbies, which may provide an insight into his interests and skills.

6. More highly skilled tradesmen are trained through the Apprentice Program at Stockham than through on-the-job training.

7. A blueprint reading course and a shop math course are offered by Stockham to employees who are interested in developing, through classroom study after normal working hours, some of the skills necessary for following the highly skilled trades.

*Millwright Trade*

8. The job Millwright 1st Class at Stockham is a critical job and a highly skilled job equivalent to what is generally known as a journeyman millwright. The duties of the job are highly varied, involving work such as precision leveling and preparation for operation of complex machinery, erection of buildings, and maintenance for and trouble-shoot-

ing of equipment. The job requires ability to weld, burn, and do most types of fabrication. Working conditions may be hazardous, including working at heights, working in close proximity to potentially fatal electric currents, and rigging and handling heavy machinery in close quarters. The Millwright 1st Class is a leader and instructor of other men working in the millwright trade. The evidence does not show that a qualified black employee ever applied for this job and was "passed over" in favor of an equally or less-qualified white employee.

9. The job of Millwright at Stockham is a critical job involving many of the same operations as the job Millwright 1st Class, but the skills of the Millwright are developed to a lesser degree than skills of the Millwright 1st Class. A Millwright may be able, by experience and outside study of mathematics, blueprints and mechanics, to move up to the job of Millwright 1st Class. Like the Millwright 1st Class, the Millwright must be able to burn and weld. The evidence does not show that a qualified black employee ever applied for this job and was "passed over" in favor of an equally or less-qualified white employee.

10. The job of Repairman at Stockham, a critical job, is a highly skilled maintenance job and is held by employees who are following the millwright trade, and in some cases, the carpenter trade. The Repairman assists the Millwright and Millwright 1st Class. The job requires some degree of skill in welding and burning. The Repairman does building repair, assists in equipment installation and steel erection, and performs or assists in the performance of the other duties of the millwright trade. The evidence does not show that a qualified black employee ever applied for this job and was "passed over" in favor of an equally or less-qualified white employee.

11. Though some employees are able through application and outside study to advance from Repairman to Millwright, or from Millwright to Millwright 1st Class, there is no automatic line of progression from Repairman to Millwright, or from Millwright to Millwright 1st Class.

12. If an incompetent or inadequately trained employee undertook to perform the duties and functions of a Millwright 1st Class, he might damage equipment or buildings; he might create a trap or hazard for other employees who came along after him; and, he might expose those people working with him to hazards in the course of installing or maintaining equipment or buildings.

### Electrician Trade

13. The job of Electrician 1st Class is a critical job involving the responsibility of handling all electrical maintenance problems, including trouble-shooting electrical and electronic equipment, repairing equipment, and laying out and preparing for the installation of electrical equipment. The Electrician 1st Class must be able to read and interpret blueprints. The job involves the constant exposure to potentially fatal electrical shock, both to the Electrician 1st Class himself and to others who follow along behind him working on equipment which the Electrician 1st Class has wired or repaired. Electricians frequently work at heights, especially in the installation and servicing of lighting and ventilation fans. The evidence does not show that a qualified black employee ever applied for this job and was "passed over" in favor of an equally or less-qualified white employee.

14. The job Electrician 2nd Class, a critical job, is a highly skilled maintenance job and involves many of the same operations as the job Electrician 1st Class, but the skills of the Electrician 2nd Class are developed to a lesser degree than those of the Electrician 1st Class. With 2 or 3 years' experience in the job of Electrician 2nd Class and with outside study of mathematics, blueprint reading and electrical codes, the

Electrician 2nd Class may be able to advance to the job of Electrician 1st Class. The evidence does not show that a qualified black employee ever applied for this job and was "passed over" in favor of an equally or less-qualified white employee.

15. If an incompetent or inadequately trained employee undertook to perform the duties of an Electrician 1st Class, he might expose himself or any other employee who came in contact with electrical equipment to a potentially fatal electrical shock.

*Machinist Trade*

16. The job Machinist 1st Class, a critical job, is a journeyman craft job requiring the capability of taking drawings, sketches, and other information, and by use of machines common to the machinist trade, preparing new parts or repairing existing parts for various pieces of equipment. The Machinist 1st Class must be capable of operating the majority, if not all, of the machines in the machine shop. The evidence does not show that a qualified black employee ever applied for this job and was "passed over" in favor of an equally or less-qualified white employee.

17. The job of Machinist 2nd Class, a critical job, is a highly skilled maintenance job and requires the operation of at least one, and usually more than one, machine in the machine shop. By operating the various machines in the machine shop over an extended period of time, and by outside study in blueprint reading, in the use of precision measuring equipment, and of elementary information on metals, metallurgy, and methods of machining metals, the Machinist 2nd Class may be able to advance to the job of Machinist 1st Class. The evidence does not show that a qualified black employee ever applied for this job and was "passed over" in favor of an equally or less-qualified white employee.

18. If an incompetent or inadequately trained Machinist undertook to perform the duties of a Machinist 1st Class, he might damage the machine he was operating; he might scrap the material on which he was working; he might cause damage to be done to the machine on which the part he was making was to be installed; and, he might cause injury to other employees or himself.

*Auto-Truck Mechanic*

19. The job of Auto Truck Mechanic, a critical job, is a highly skilled maintenance job and involves the maintenance and repair of the various pieces of rolling stock used throughout the Stockham plant. There is no entry level job from which a man can progress to the job of Auto Truck Mechanic, and there is no apprentice program for this job. The evidence does not show that a qualified black employee ever applied for this job and was "passed over" in favor of an equally or less-qualified white employee.

*Pattern Maker Trade*

20. The jobs of Pattern Maker, job class 13, and Pattern Assembly and Repairs, job class 10, are both critical jobs in the Pattern Shop department. The Pattern Maker is a highly skilled craftsman who takes engineering drawings and, by use of hand tools and machine tools, makes a master pattern. From this master pattern, metal patterns for use in making the molds in the foundries are cast. The Pattern Maker takes these metal patterns and finishes them, matching them together perfectly, and places them on a pattern plate so that the two sides of the pattern match perfectly. The job of Pattern Assembly and Repairs is a highly skilled maintenance job involving the repair of patterns through the use of a variety of hand and machine tools. The job of Pattern Maker and the job of Pattern Assembly and Repairs require similar qualifications. However, the class 13 job demands that the skills involved in working with patterns be developed to a much higher degree than the class 10 job. Employees holding these jobs must have good manual dexterity, for they are working with their hands in very precise

work; they must be able to use mathematics such as trigonometry and shop math, including working with fractions and decimals; they must be able to interpret and work from engineering drawings; they must be able to work largely unsupervised; and they must understand the expansion characteristics of the metals with which they will be working. It is almost a necessity that the Pattern Maker shall have completed an apprentice program for his trade. The evidence does not show that a qualified black employee ever applied for these jobs and was "passed over" in favor of an equally or less-qualified white employee.

### Blacksmith

21. The job of Blacksmith, a critical job, is a craft maintenance job involving the heating, shaping and forming of metals. No other job at Stockham would directly qualify a man to perform the duties of the job of Blacksmith.

### Welder Trade

22. Though the jobs of Union Melt Machine Welding, job class 9, Electric Acetylene Repair Welding, job class 11, and Welder Specialist, job class 13, in the valve Machining and Assembly department are all critical jobs and are somewhat related, the degree of skill required varies greatly from job to job. The Welder Specialist does critical welding on parts for steel valves and overlays of hard facing material on various grades of stainless steel. Different welding techniques are required on different alloys of metal. His work is not repetitive, and he must work with a minimum amount of supervision. The Welder Specialist must have a minimum of two years experience as a welder, and he must pass a test designed to prove his ability to weld on pressure-containing surfaces. The job of Union Melt Machine Welding requires considerably less skill than the job of Welder Specialist. The class 9 job does not necessarily provide training for the class 11 job, which, in turn, does not necessarily provide training for the class 13 job. The degree of skill required in each of these three jobs is clearly distinguishable, with the Welder Specialist job being a craft job and the other two jobs being highly skilled jobs. The evidence does not show that a qualified black employee ever applied for any of these jobs and was "passed over" in favor of an equally or less-qualified white employee.

23. The job Electric Acetylene Repair Welding can provide some training for the class 13 Welder Specialist job, but operation of the Union Melt Welding Machine, class 9, does not provide training in acetylene or electric welding, which are both required in the class 11 Electric Acetylene Repair Welding job. The difference in the degree of skill required between the class 11 job and the class 13 job is considerable.

24. In order to become a class 13 Welder Specialist, the employee must know the various overlays to be applied, the hard facing and how to apply it, and how to weld on various alloys of stainless steel. The types of welding involve different welding rods, different fluxes, different settings on the welding machine, and different heat settings. There is no training or apprentice program provided by Stockham to prepare a welder to move to the class 13 Welder Specialist job.

25. Welder, job class 10, is a critical job. A Welder is a highly skilled maintenance job in the maintenance department. The job requires skills and extensive training and involves an entirely different type of welding from that which is done in the Valve Machining and Assembly department. There is no apprentice program or on-the-job training which leads to the job of welder.

### Conclusion

26. Each of Stockham's highly skilled and craft maintenance jobs requires most, if not all, of the following skills or abilities: the tradesman has to be able to read some type of graphic representations, such as drawings, blue-

prints, schematics, or flow diagrams; the tradesman must be able to read instruction manuals for the installation and operation of equipment and he must be able to read and comprehend basic technical literature; and, the tradesman must be competent in some level of mathematics, ranging from trigonometry for electricians to the use of fractions and decimals with very high degree of accuracy for machinists. Thus, these are all extremely critical jobs.

Each of Stockham's above-described highly skilled and craft maintenance jobs are critical jobs which meet one or more of these criteria: (1) it requires a lengthy training period; (2) it requires high levels of skill; (3) it involves safety of the worker, his co-workers, and the ultimate users of the product; (4) it is essential to the quality of the product; (5) it requires the operation or preservation of expensive and/or dangerous equipment.

### (2) Craft and Highly Skilled Production Jobs

27. The jobs of Box Floor Molder (Large), Ductile Melter, G & L Machine Operator, Oven Operator, Crane Operator, Heat Treater, Machine Service Man, and Service Mechanic are all critical jobs and are craft and highly skilled production jobs requiring an apprenticeship or extensive training. Each of these jobs requires the operation of expensive equipment and affects the safety of the particular employee on the job and other employees around him, or those following behind him.

### *Box Floor Molder (Large)*

28. In the Grey Iron Foundry department at Stockham, iron is melted in a cupola. Molds made from specially treated sand are formed on molding units numbered 1 through 4 and in an area called the box floor. The molten iron is poured into the molds, and after cooling, the sand is shaken off. The rough castings which have been produced are cleaned and ground to remove rough spots or imperfections in the casting. Molds for the largest castings are made by hand in the area called the box floor.

29. The molding operations carried out in the box floor area of the Grey Iron Foundry are quite different from the molding operations on Units 1 through 4 in the Grey Iron Foundry. While the molding machine operators on units 1 through 4 may produce hundreds of machine-made molds each day, the Box Floor Molder (Large) may make only 3 molds a day and thus produce only 3 castings in one day. The Box Floor Molder (Large) makes the largest castings—16″ pipe size and larger—for both fittings and valves. He works largely by hand, rather than by using a molding machine. He uses a pattern which is generally on a board. Molding sand is placed on top of the pattern in a large box, or flask, which holds the sand in the mold. A "sand slinger" may be used to "sling" sand under pressure against the pattern in the flask. This process is called "ramming" the sand around the pattern.

The job of Box Floor Molder (Large), job class 12, is a highly skilled, critical job. The evidence does not show that a qualified black employee ever applied for this job and was "passed over" in favor of an equally or less-qualified white employee. On rare occasions, Stockham is able to hire a journeyman molder who has attained these skills through completion of an apprentice program with some other employer. In most cases, however, the Box Floor Molder (Large) has completed a Stockham apprentice course involving four years of classroom and on-the-job training. The Box Floor Molder (Large) must be in very good health, and physically tough and strong, because he does relatively heavy work. He must be highly dependable, and he must have better-than-average intelligence. His work is not repetitive—he may not repeat a particular casting for several months. The molds that he makes are for castings which are not

high-production items, but are for very special work. The working conditions on the box floor are somewhat less desirable than in other parts of the foundry because not only does the Box Floor Molder (Large) make the mold there, but the molten iron is also poured into the mold at that point. In contrast, on the molding machine lines (Units 1 through 4), the mold is made in one place and placed on a conveyor to have molten iron poured into it at another place. Thus, the Box Floor Molder (Large) is subjected to more heat and fumes than the molding machine operators in the foundries.

The job of Box Floor Molder (Large) differs considerably from the job of Box Floor Molder (Small), job class 7. The Box Floor Molder (Small) makes certain small castings which are not run often enough to make it profitable to run them on the high-production molding machines on Units 1 through 4. That is, the size of the moldings produced by the Box Floor Molder (Small) is the same as those produced on a production unit; but the quantity produced is not great enough to justify producing them on the high-production molding machines. The Box Floor Molder (Small) is not a highly skilled tradesman as is the Box Floor Molder (Large).

30. The job of Box Floor Molder (Large) is a non-incentive job because the work is entirely non-repetitive.

31. The Box Floor Molder (Large), job class 12, works on the box floor under conditions of heat and fumes caused by the pouring of molten iron into the large molds made by the Box Floor Molder (Large).

*Ductile Iron Melter*

32. Ductile Iron Melter, job class 12, is a critical job. The Ductile Iron Melter operates a direct arc electric furnace to produce ductile iron in the Grey Iron Foundry department. He operates the furnace to change the chemical composition of a 2,000 pound charge of malleable iron so that it has the steel-like properties of ductile iron. Producing acceptable ductile iron is a complicated process involving considerable skill and responsibility on the part of the Ductile Iron Melter. The Ductile Iron Melter must be physically strong enough to work around the heat generated by the furnace in bringing the molten metal to a temperature of 2,800 degrees Fahrenheit. He must be able to read and write and make calculations. He must keep detailed melting records and work closely with the Metallurgical Department in maintaining the proper quality of the ductile iron. He must be extremely adept in using the magnesium alloy which goes into the making of ductile iron in exactly the proper amounts and under the proper conditions. He works largely unsupervised in a very responsible job requiring the exercise of discretion. If the Ductile Iron Melter makes a mistake in the operation of the furnace, the product of the furnace may not be ductile iron at all. The 2,000 pound charge of molten metal must be poured within five to ten minutes after it is prepared. If the iron is poured and it then turns out that the iron is not high quality ductile iron, the metal castings are scrap and the molds have been wasted. The Ductile Iron Melter is subjected to heat, smoke, and gases from the molten iron. The evidence does not show that a qualified black employee ever applied for this job and was "passed over" in favor of an equally or less-qualified white employee.

*G & L Machine Operator*

33. The critical job of G & L Machine Operator in the valve machining area of the Valve Machining and Assembly department requires extremely high skills in the operation of precision machining equipment. Each piece of work run on this machine is essentially a one-of-a-kind operation. The G & L Machine Operator must be able to perform shop mathematics, including some geometry and trigonometry. He must be able to read shop drawings, specifications, and blueprints. The skills required by this

**464**

job are essentially the same as those of a Machinist 2nd Class. The evidence does not show that a qualified black employee ever applied for this job and was "passed over" in favor of an equally or less-qualified white employee.

### Oven Operator

34. Oven Operator (malleable annealing), job class 13, in the Malleable Foundry department is a critical job. The Oven Operator is responsible for operating three gas-fired continuous annealing ovens at temperatures of 1,750 degrees Fahrenheit, 24 hours a day, seven days a week. These ovens are used to anneal, or harden, malleable iron and ductile iron fittings. An Oven Operator would first have to serve as a Continuous Annealing Oven Helper, job class 5, over an extended period of time to become completely knowledgeable about the operation of the annealing ovens. The Oven Operator must be highly dependable because he works unsupervised at night and on weekends. Operation of the furnaces is hazardous, and improper operation could cause an explosion. The operator must exercise good judgment to avoid such an explosion which would damage the extremely expensive annealing oven. The Oven Operator must be able to read and follow written instructions. The working conditions of the Oven Operator involve working in heat as great as or greater than that found in the Grey Iron Foundry department. There have been no vacancies in the Oven Operator job for a number of years. The evidence does not show that a qualified black employee ever applied for this job and was "passed over" in favor of an equally or less-qualified white employee.

### Crane Operator

35. Crane Operator, job class 11, is a critical job. Crane Operators work outside the grey iron and malleable foundries and inside the grey iron foundry in the box floor area. The cranes they operate are approximately 20 feet above the ground in the box floor area and 60 to 70 feet above the ground outside the grey iron and malleable foundries. The cranes move in three planes: the entire crane moves on tracks, the carriage on the crane moves across the crane from one side to the other, and the clamshell or electromagnet on the crane moves up and down. The crane operator is often called upon to operate the crane in all three of these planes at the same time. The crane operator over the box floor lifts molds, flasks, and ladles of molten iron to be poured into the molds. The outside crane operator primarily unloads railroad cars of raw material and charges the cupolas at the foundries. The operator rides in a cab suspended from the crane. The crane operator must be a highly dependable employee; he must have good eyesight, he must be able to work at heights; he must be able to work in a confined area such as the cab in which the crane operator rides; he must be able to read and write; he must be intelligent; and he must follow instructions well. In charging the cupola, the crane operator must weigh exactly the proper amount of raw material to "charge" the cupola. If the crane operator makes an error in the cupola charge 3,000 to 4,000 pounds of scrap metal will be produced; and if this metal is poured into molds to form castings, the castings will be scrap and the molds will have been wasted. The crane operator must be extremely attentive, for he operates over a large area where other men may be working below him on the ground. An inattentive or careless crane operator could easily injure or kill someone working below him. The working conditions on the outside crane are substantially the same as the outside weather conditions. The box floor crane operator works under conditions essentially the same as those for the Box Floor Molder (Large). He is working above the box floor area where molds are being poured with molten iron. The crane operator is subjected to the heat, fumes, and dust generated from the pouring of molten iron into the

molds on the box floor. The evidence does not show that a qualified black employee ever applied for this job and was "passed over" in favor of an equally or less-qualified white employee.

36. The usual practice in training a Crane Operator, job class 11, at Stockham, is that the man is trained first on the inside crane above the box floor in the Grey Iron Foundry department. Later, when there is an opening on one of the outside crane jobs, the inside crane operator moves to the outside crane, and a new man is trained on the inside crane.

37. The Crane Operator, job class 11, works near the box floor under conditions of heat and fumes caused by the pouring of molten iron into the large molds made by the Box Floor Molder (Large).

### Heat Treater

38. Heat Treater, job class 13, is a critical job and a craft production job in the Tapping Room department. The Heat Treater must have a working knowledge of metallurgy in order to be able to treat individual alloys of steel to obtain the desired hardness. There are no courses or apprentice programs offered by Stockham which would train a man in metallurgy; the Heat Treater must acquire this knowledge on his own before he goes on this job. The Heat Treater uses test equipment to test the hardness of the particular metals to ascertain that they are within specifications. He works with limited supervision. The evidence does not show that a qualified black employee ever applied for this job and was "passed over" in favor of an equally or less-qualified white employee.

### Machine Service Man

39. Machine Service Man, job class 11, in the Valve Machining and Assembly department is a critical job and a highly skilled production job. The Machine Service Man must be familiar with the various tools, jigs, and fixtures used in the valve machining area. He must be able to use tools such as sharpeners and grinders, and he must be able to read to determine which jobs are scheduled to be performed in the department so that he will have the proper tools prepared as they are needed. He works with minimum supervision, and he must be capable of examining the tooling used by the machine operators to determine which tooling is serviceable and which tooling needs sharpening or repairs. The evidence does not show that a qualified black employee ever applied for this job and was "passed over" in favor of an equally or less-qualified white employee. .

### Service Mechanic

40. Service Mechanic, job class 13, is a critical job in the Valve Machining and Assembly department and the Tapping Room department. The Service Mechanic must be familiar with the set up and operation of all the machines and all the products in his particular area. In evaluating an employee for this position, Stockham looks at the man's work record, both with respect to quality and quantity, his attendance record, and his dependability. The Service Mechanic must have operated the majority of machines in his department. He must be able to read and write and to communicate orally. He must read shop drawings, blueprints, and job specifications. He must work with a minimum of supervision. His communication skills must include the ability to train new machine operators, and he must communicate orally with the Set-up Men or Service Mechanics on other shifts and with his supervisor. The evidence does not show that a qualified black employee ever applied for this job and was "passed over" in favor of an equally or less-qualified white employee.

### Conclusion

41. The job of Molding Machine Operator, job class 5, is a highly repetitive operation requiring little or no judgment in the operation of a largely automated machine. Operation of such a

molding machine would not train or qualify an employee to be a Box Floor Molder (Large). Furthermore, there is no correlation whatever between the job of Molding Machine Operator and the jobs of G & L Machine Operator, Crane Operator, Ductile Iron Melter, or Oven Operator.

Each of Stockham's above-described craft and highly skilled production jobs are critical jobs which meet one or more of these criteria: (1) it requires lengthy training period; (2) it requires high levels of skill; (3) it involves safety of the worker, his co-workers, and the ultimate users of the product; (4) it is essential to the quality of the product; (5) it requires the operation or preservation of expensive and/or dangerous equipment.

### (3) Skilled Production Jobs

42. Stockham has a number of skilled production jobs which require experienced operators to use complex, expensive and often dangerous equipment. These operators must work with little supervision and must exercise discretion.

43. The critical jobs of Machine Operator (valve finishing), Machine Operator (steel valve finishing), Setup Operator (tapping), Three-Way Flange Fitting Facer and One-Way Facer (Moline), Drill Press Operator, Finishing Union Heads and Tails, Process Inspector, Automatic Screw Machine Operator, Union Melt Machine Welding, Valve Repairman, Pattern Assembly and Repairs, and Teflon Products Operator require skills, capabilities, and/or training not necessary for the highly-repetitive production jobs in the Stockham plant. The evidence does not show that a qualified black employee ever applied for these jobs and was "passed over" in favor of an equally or less-qualified white employee.

44. Machine Operators, job classes 8 and 9, in the Valve Machining and Assembly department take blank castings and machine them by performing facing, drilling, boring, and threading operations through the use of precision machine tools. The types of machines operated by a machine operator in this department vary with each particular operation.

45. The basic qualifications for a Machine Operator in the Valve Machining and Assembly department are that the Machine Operator must be able to read shop drawings and specifications, he must be able to use precision measuring devices, he must properly set the "speed" (the rate at which the machine, or casting in the machine, turns) and "feed" (the amount that the cutting tool moves into the casting being machined during each revolution of the tool or casting) to insure safe operation of the machine, he must be able to work to tolerances of ten-thousandths of an inch, he must be willing to provide his own precision measuring tools and measuring equipment, and he must be able to use mathematics involving fractions and decimals to high degrees of accuracy and to convert fractions to their decimal equivalents. The evidence does not show that a qualified black employee ever applied for this job and was "passed over" in favor of an equally or less-qualified white employee.

46. The critical jobs of Pattern Maker and Pattern Assembly and Repairs are, respectively, highly skilled and skilled positions requiring the capability of working with metals, and the use of hand and machine tools to high levels of accuracy. The job of Pattern Maker requires the completion of an apprenticeship or equivalent training. Both of these jobs involve skills and capabilities not demanded of repetitive production jobs.

47. The Setup Operator in the Tapping Room Department, job class 7, "sets up", or adjusts, a "battery" of five to seven machines so that they perform the proper tapping operation on either a male or female thread, to prescribed specifications and standards. He also checks the products run on this battery of machines to make certain that they

meet the prescribed specifications and standards. The Setup Operator occasionally relieves the Chucker. A Setup Operator, therefore, must have held the job of Chucker in the Tapping Room. Chuckers with the best production and safety records are considered for promotion to the job of Setup Operator. The Setup Operator must be able to read and understand the product specifications; and he must be able to use precision measuring devices such as gauges, squares, and alignment bars. The evidence does not show that a qualified black employee ever applied for this job and was "passed over" in favor of an equally or less-qualified white employee.

48. The Three-way Flange Fitting Facer in the Tapping Room department faces up to three flanges on a fitting at the same time. The One-way Flange Fitting Facer faces one face of a fitting at a time.

49. The Drill Press Operator in the Tapping Room department uses a drill press to drill bolt holes in the flanges of flange fittings. The bolt holes must be drilled precisely so that they will match up with the bolt in any other flange fitting designed to be used with that flange fitting. The Drill Press Operator must be physically tall and strong in order to be able to lift heavy objects to the drill press table which is at a fixed height above the floor.

50. A union, one of the products manufactured by Stockham, is composed of three parts—the nut, head, and tail. In a bronze-mounted union, a brass ring is mounted in the head. The tail fits against this bronze ring, and the nut holds the head and tail together to form a union. The job of Finishing Union Heads and Tails in the Tapping Room department involves the operation of a machine which does precision machining operations on the head and tail of the union at the same time.

51. In considering employees for the critical jobs of Drill Press Operator, Finishing Union Heads and Tails, and Three-way Flange Fitting Facer and One-way Flange Fitting Facer, Stockham considers the employee's production record with regard to both quantity and quality, his safety record with regard to both equipment and personnel, his attendance, and his willingness to buy the necessary precision measuring tools. Operators on these jobs must be able to read job specifications and shop prints, and they must be physically qualified to do the job. Drill Press Operators, for example, must have considerable height to be able to lift castings to the drill press table. Castings weighing 40 to 50 pounds or more are handled by a hoist, but an operator in these positions may be required to handle weights of up to 40 or 50 pounds many times during the working day. The operator, therefore, must be physically able to perform these duties. The evidence does not show that a qualified black employee ever applied for these jobs and was "passed over" in favor of an equally or less-qualified white employee.

52. The Process Inspector in the Tapping Room department, job class 8, checks the product of the machines to ensure that the product meets quality standards. He must use precision gauges, squares, and alignment bars. In considering an applicant for this job, Stockham looks at the applicant's past work record, giving particular emphasis to his quality record and his attendance, dependability, and ability to use precision measuring devices. The Process Inspector must be able to read specifications and job standards; he is called upon to make written reports on the defects he discovers; and he may be required to leave written instructions to a Process Inspector on another shift. He must be physically able to handle larger manufactured parts in the process of inspecting and gauging them. The evidence does not show that a qualified black employee ever applied for this job and was "passed over" in favor of an equally or less-qualified white employee.

53. The critical job of Automatic Screw Machine Operator, job class 9, in

the Tapping Room department and the bronze valve area of the Valve Machining and Assembly department involves setting up, or adjusting, an automatic machine which produces a number of component parts of Stockham's products, such as stainless steel seat rings or brass valve stems in the brass valve area, and union parts in the Tapping Room department. Proper operation and adjustment of these automatic machines requires a high degree of skill. In considering applicants for the job of Automatic Screw Machine Operator, Stockham considers the employee's work record, with regard to both quality and quantity, and his attendance, dependability, and willingness to furnish his own tools and precision measuring equipment. The operator must be able to read blueprints and specifications. The evidence does not show that a qualified black employee ever applied for this job and was "passed over" in favor of an equally or less-qualified white employee.

54. The critical job of Union Melt Machine Welding, job class 9, is a skilled production job which requires many of the skills of a welder but to a lesser degree. The evidence does not show that a qualified black employee ever applied for this job and was "passed over" in favor of an equally or less-qualified white employee.

55. The Valve Repairman, job class 9, in the Valve Machining and Assembly department must be able to read instructions and use hand tools and power tools such as rotary and belt sanders. He must be able to communicate with the valve assembly supervision and the Machine Operators in the valve machining area in the jargon of the Valve Machining and Assembly department. He learns this jargon over a period of time by working in the valve-producing areas of the Stockham plant. The evidence does not show that a qualified black employee ever applied for this job and was "passed over" in favor of an equally or less-qualified white employee.

56. The Teflon Products Operator in the Metallurgical department must be able to read; he must have good eyesight; and he must be physically able to stand all day while doing his job. The evidence does not show that a qualified black employee ever applied for this job and was "passed over" in favor of an equally or less-qualified white employee.

57. Operation of a molding machine in one of the foundries at Stockham does not qualify an employee for the job of Machine Operator in the Valve Machining and Assembly department. Operation of a molding machine does not involve the use of measuring devices and does not require the reading of blueprints or job specifications. The molding machine does not have revolving parts, and the safety hazard to the operator and employees working around the operator are not as great as they are with the Machine Operator's job. Compared to the machines in the valve machining area of the Valve Machining and Assembly department, the molding machines in the foundries are very simple machines.

58. The Machine Operator in the Valve Machining area must read a shop drawing and be able to follow it to make a good product without consulting his Service Mechanic or foreman.

*Conclusion*

59. Each of the above-described skilled production jobs is a critical job which requires skills and abilities not acquired in normal repetitive jobs. They each involve the operation of expensive, intricate and complex equipment under little supervision.

60. Each of the above-described skilled production jobs is a critical job which meets one or more of the following criteria: (1) it requires a lengthy training period; (2) it requires high levels of skill; (3) it involves safety of the worker, his co-workers, and the ultimate users of the product; (4) it is es-

sential to the quality of the product; (5) it requires the operation or preservation of expensive and/or dangerous equipment.

## II

## FINDINGS OF FACT WITH REGARD TO ALLEGED DISCRIMINATION AGAINST BLACK EMPLOYEES AS A CLASS

A. Earnings of Production and Maintenance Employees at Stockham

1. Plaintiffs placed primary reliance in this case upon an alleged disparity in pay between black and white employees at Stockham as the basis for an inference of discrimination against blacks as a class. Plaintiffs' "statistics" relative to earnings were a simple mathematical averaging of actual earnings reflecting some difference, albeit a small one, between the average earnings of black employees and those of whites. Plaintiffs made no adjustment of any kind for productivity factors which this Court finds, based upon uncontradicted expert testimony, are basic determinants of individual earnings.

2. Dr. James Gwartney, a professor of economics at Florida State University and an associate in the consulting firm, Economic Services, prepared an earnings study of the factors that influence earnings of Stockham production and maintenance employees with particular emphasis on earnings differences according to race or color.

3. Dr. Gwartney received a PhD degree in Economics from the University of Washington and has devoted substantially all of his professional career to the economics of discrimination, an advanced micro-theory and micro-topics.

4. Dr. Gwartney has published a number of articles in various professional journals dealing with discrimination and income differentials and he has presented numerous professional papers dealing with a variety of topics including how discrimination as to earnings should be measured.

5. According to Dr. Gwartney, productivity factors influence earnings. A productivity factor is the ability of an individual to perform a given job; productivity factors relate to performance. The productivity factors for which Dr. Gwartney adjusted were, by and large, employee characteristics which the employee brought with him to Stockham.

### Data Used

6. Dr. Gwartney obtained from Stockham productivity information contained in employee personnel records to aid his study.

7. The data collected, recorded and sent to Dr. Gwartney was gathered without regard to its possible impact on Dr. Gwartney's analysis.

8. Information from the records and files of all production and maintenance employees at Stockham since 1965, whether still employed or terminated, including: the name; race; social security number of each individual; initial job information including department; job title; job code and base pay; current job information as of August 31, 1973; intermediate changes in employment at Stockham since 1965; sex; merit rating for 1965, 1969 and 1973; date of birth; actual earnings and hours worked for 1965, 1969 and 1972; and, years of schooling was collected, recorded and sent to Dr. Gwartney for purposes of his study.

9. Information from the records and files of all production and maintenance employees at Stockham employed as of August 31, 1973, including days absent during 1965, 1969, 1972 and 1973 and prior job experience, was collected, recorded and sent to Dr. Gwartney for purposes of his study.

### Methods Used

10. According to Dr. Gwartney's uncontradicted testimony, there are four methods that may be used to study the employment opportunities relative to earnings of a single firm. No one of these methods is conclusive, but collectively they offer strong evidence of the

presence or absence of earnings discrimination.

11. The four methods are: (1) Comparison of earnings at the individual firm with those in the local, regional and national labor markets as well as in other firms; (2) Changes in earnings of employees who have been employed by the firm for a long period of time; (3) Earnings of employees recently hired; and, (4) Adjusting earnings for productivity factors by application of the residual statistical technique.

### (1) *Comparison with Local, Regional, and National Labor Markets*

12. An analysis of U. S. Census data shows that there is a strong positive relationship between education and earnings within education groupings; that is, the higher the education level, the higher earnings regardless of race or occupation.

13. An analysis of U. S. Census data also shows that within educational groupings according to skill level among blue collar workers (craftsmen, operatives, labor and service), there is a strong positive relationship between skill level and earnings for both blacks and whites.

14. According to Dr. Gwartney's uncontradicted testimony, the mere existence of a difference in aggregate black earnings and aggregate white earnings is not proof of employment discrimination. Much more than aggregate earnings is needed before earnings differences can be proof of employment discrimination.

15. Dr. Gwartney further testified that comparing the earnings of individuals with different skill levels is misleading. The aggregate earnings differences between two groups of people may lead to unjustified conclusions if productivity factors are not considered.

16. Stockham's non-incentive workers have an unadjusted average hourly rate of $3.85 for white employees and $3.32 for black employees. The unadjusted actual earned rate is $4.24 for white em-

ployees and $3.67 for black employees. The unadjusted, average hourly rate for all workers is $3.63 for white employees and $3.08 for black employees; the unadjusted actual earned rate is $4.20 for white employees and $3.83 for black employees. (Plaintiffs' Ex. 96 and 97)

17. The unadjusted earnings of Stockham's black employees are on average approximately 91% of unadjusted earnings of white employees and there is a $.37 per hour unadjusted difference between the earnings of white employees and earnings of black employees. (Plaintiffs' Ex. 90)

18. Within educational groupings, the relative earnings of blacks to whites at Stockham exceeded the relative earnings of blacks to whites in the Birmingham Standard Metropolitan Statistical Area ("SMSA") in 1969 by 11.5% to 70.0%. Not only were the relative earnings of blacks at Stockham greater but the absolute dollar earnings of black production and maintenance employees at Stockham exceeded the earnings of blacks in the Birmingham SMSA in total and within every educational grouping. This difference in favor of Stockham employees is understated somewhat because the data for Stockham included earnings only from Stockham while the income data for the Birmingham SMSA included earnings from all sources.

19. Of the 2,274 Stockham production and maintenance employees who had earnings in 1972 and for whom data on years of schooling were available, 68% were black (728 white and 1,546 black). Of the 728 whites, 448 (or 61.5%) had 12 years of schooling or more and of the 1,546 blacks, 774 (or 50.1%) had 12 years of schooling or more. (Stockham Ex. 4)

20. The black to white earnings ratio at Stockham for the year 1969 within education groupings was 22.5% to 52.5% greater than the black to white earnings ratio for the South.

21. The black to white earnings ratio at Stockham for the year 1969 exceeds the national black to white earnings ra-

tio for 1969 within education groupings by 17.9% to 38.3%. (Stockham Ex. 8)

22. Stockham's black to white earnings ratio exceeds the black to white earnings ratio of the blue collar workers in the United States by 12.3% to 29.1% within educational groupings. (Stockham Ex. 10)

23. When blue collar workers are divided into their components (craftsmen, operatives, servicemen and laborers), Stockham's black to white earnings ratio exceeds the earnings ratio of each component of blue collar workers in the United States by 27.4% to 43%. (Stockham Ex. 12)

24. Stockham's black to white earnings ratio exceeds that of the blue collar workers employed by the federal government in 1969 by 9.5% to 22.2% within educational groupings. (Stockham Ex. 14)

25. The federal government has a reputation of being a low discrimination employer which has had an overt and vocal policy of non-discrimination for a number of years.

26. Stockham's black to white hourly earnings ratio exceeded that of the federal blue collar workers for 1969 by 5.4% to 16.5% within educational groupings. (Stockham Ex. 16)

27. The black to white earnings ratio at Stockham exceeds the black to white earnings ratio of the federal government within educational cells for both hourly and annual earnings.

28. The representation of blacks among Stockham production and maintenance employees exceeds the representation of blacks among federal blue collar workers by 89.2% to 185.5% within educational groupings. (Stockham Ex. 17)

29. The representation of blacks among blue collar employees of the federal government is 23.7% and among production and maintenance employees at Stockham is 68%. (Stockham Ex. 17)

30. Approximately 11% of the national work force is black and approximately 23.7% (or twice as many) of the federal blue collar workers are black. Approximately 68% (or almost 3 times the percentage of blacks in the local labor market) of Stockham's employees are black.

31. Approximately 25% of the Birmingham SMSA work force is black and 68% of Stockham's work force is black. Stockham's representation of blacks to whites exceeds the representation of the local labor market by 177.6%. (Stockham Ex. 4)

32. Both the annual and hourly black to white earnings ratios at Stockham exceed those of the federal government for 1969. Stockham's representation of blacks to whites exceeded the representation of blue collar workers employed by the federal government in 1969 by 9.5% to 22.2% within educational groupings. (Stockham Ex. 4)

33. Within educational groupings, both the relative earnings of blacks to whites at Stockham and the representation of blacks to whites at Stockham substantially exceed the Birmingham SMSA averages. These facts prove by a great preponderance of the evidence that, relative to the local labor market, Stockham is offering earnings opportunities on a non-discriminatory basis which black employees find attractive, and the Court so finds. Based on the attractiveness of the relative earnings opportunities at Stockham and the absence of a policy of racial discrimination, there has been a migration of blacks to Stockham.

(2) *Changes in Earnings of Employees at Stockham*

34. The black to white hourly earnings ratio for all production and maintenance employees at Stockham increased from 85.4% in 1965 to 90–92% in 1972–73. (Stockham Ex. 18)

35. The black to white hourly earnings ratio for all skilled, semi-skilled and unskilled workers (those in job classes 2 through 9 and the apprentices)

increased from 86.3% in 1965 to 96%–98% in 1972–73. (Stockham Ex. 18)

36. An informal skill level adjustment separates the highly skilled and craft employees as defined by the United States Census and according to the EEO–1 reports Stockham has filed (those employees in job classes 10–13) from the skilled, semi-skilled and unskilled employees (those in job classes 2–9 and the apprentices). (Plaintiffs' Ex. 13)

37. When changes in productivity characteristics of employees are held constant by looking at a similar group of employees, i. e., those employed both in 1965 and 1972, the annual earnings of black employees increased from $4,748 in 1965 to $7,030 in 1972, an increase of 48.1%. The annual earnings of white employees increased from $5,713 in 1965 to $8,014 in 1972, a 40.3% increase. The earnings of black employees increased from 83.1% of those of white employees in 1965 to 87.7% of those of white employees in 1972. (Stockham Ex. 19)

38. In terms of absolute dollars and in terms of percentage rate of change, both the annual earnings and the hourly earnings of blacks at Stockham increased from 1965 more rapidly than those of whites. (Stockham Ex. 19, 20)

39. The earnings increase of skilled, semi-skilled and unskilled black employees (those in job classes 2 through 9 and apprentices) over similar white employees were even greater in both annual earnings and hourly earnings. For this group of employees, the annual earnings gain of black employees was 47.9% as compared with 35.5% for white employees; a relative increase of 9.2%. (Stockham Ex. 21) The hourly earnings gain of black employees was 38.9% as compared with 33.3% for white employees; a relative increase of 4.2%. (Stockham Ex. 22)

40. The earnings gains of blacks employed at Stockham during both 1965 and 1972, whether stated in annual terms or hourly terms, exceeded the earnings gains of whites employed at Stockham during both 1965 and 1972. (Stockham Ex. 19–22)

41. The relative earnings of employees hired since 1965 is a meaningful indicator of employment opportunity policies as to earnings during the 1965 through 1972 period because such employees are less affected by pre-1965 employment practices of both Stockham and other employers.

(3) *Earnings of Employees Recently Hired*

42. Among skilled, semi-skilled and unskilled employees (those in job classes 2 through 9 and apprentices) hired between 1965 and 1972, the annual earnings of blacks exceeded whites in 6 of 11 age-education cells and the black to white annual earnings ratio was 104.5%. (Stockham Ex. 23)

43. The hourly earnings of skilled, semi-skilled and unskilled Stockham employees (those in job classes 2 through 9 and apprentices) hired between 1965 and 1972 show a black to white hourly earnings ratio of 98.9%. Within age and education cells there is a random distribution of earnings ratios with blacks exceeding whites in some cells and whites exceeding blacks in others. This random pattern would be expected when a firm offers equal earnings opportunities, according to the expert testimony of Dr. Gwartney. (Stockham Ex. 24)

(4) *Adjusting for Productivity Factors by Regression Analysis*

44. Regression analysis is a statistical technique by which adjustment can be made simultaneously for more than three productivity characteristics. The technique allows one to place a dollar value on each variable reflecting its impact on earnings. In the case *sub judice*, adjustments were made by Dr. Gwartney simultaneously through the use of regression analysis techniques for each of these variables: years of schooling; seniority; skill level; outside craft experience; outside operative experience; absenteeism; merit rating;

and, achievement. (Stockham Ex. 30–33) Plaintiffs failed to introduce evidence of such adjustments for either the Stockham earnings data proffered by plaintiffs in this case, or the earnings data proffered by Stockham.

45. According to the uncontroverted testimony of Dr. Gwartney, it is better to adjust for *some* productivity factors than not to adjust for any; by adjusting for those productivity factors capable of measurement or reasonable estimate, it is possible to move toward a comparison of more similar employees in terms of their productivity characteristics.

46. There are different achievement levels for blacks and whites with equal years of schooling which are attributable to such things as differences in public expenditures, family background characteristics, home environment and community environment, and not to differences in intelligence or native ability.

47. Noting quantity of schooling alone is not an adequate productivity adjustment; quality of schooling must also be considered. The achievement level of whites exceeds that of blacks even when the two groups have equal years of schooling. At grade level 12 the black-white achievement differential is between 2.5 and 3.7 grade. (Stockham Ex. 27)

48. Two national studies indicate that when blacks and whites have an equal quantity of schooling, the achievement factor accounts for lower earnings for blacks measured at between 14.6% and 17.2% in one study and between 12.-2% and 18.1% in the other. (Stockham Ex. 28)

49. Because of the educational achievement factor, blacks with the same quantity of schooling as whites would be expected to earn only about 85% as much as whites. (Stockham Ex. 28, 29)

50. Outside craft experience (*i. e.*, previous work experience) of Stockham employees was 2.7 years for whites and 1.2 years for blacks or an average of 1.7 years. Outside craft experience was tabulated in terms of years using the U. S. Census definition for craft jobs. This definition includes military or armed service time as craft skill and possibly accounts for what seems to be a high average of craft skill for both blacks and whites. (U. S. Census; Stockham Ex. 55)

51. At the 96% confidence level, the mean of the range of estimates showed an unadjusted annual earnings differential of $448 in favor of whites. The differential was increased to $570 when seniority was considered (blacks had more seniority than whites). The addition of each of the other seven variables reduced the earnings differential and when all variables were considered simultaneously, the mean differential was −$299, with the range being between $16 to −$592. When adjustments were simultaneously made for seniority, years of schooling, skill level, outside craft experience, outside operative experience, absenteeism, merit rating and achievement, the annual earnings of whites at Stockham were estimated to be $299 less than the annual earnings of blacks. (Stockham Ex. 30)

52. After adjusting simultaneously for each of the eight factors, the hourly earnings of whites at Stockham exceeded those of blacks by 3.1 cents per hour with a range from +13.3 cents to −7.1 cents. The adjusted hourly wage rate of blacks was 99.2% of that of whites and the adjusted annual wage of blacks was 104.3% of that of whites. (T. Gwartney 2006; Stockham Ex. 30)

### (5) *Conclusion*

53. The application of the four methods separately and collectively to the earnings of Stockham's employees causes the Court to conclude that between 1965 and 1973, Stockham offered equal opportunities in earnings to its employees without regard to race.

*Miscellaneous Findings As To Earnings*

54. The classification of jobs at Stockham into job classes 2 through 13

is a system for rating the complexity of a job or the skills required to perform the job. The complexity and required skills increase as the job-class number increases. Though each succeeding job class has a higher base pay rate than the next lower job class, the job classification system is not determinative of the actual earnings of the workers in the job class. (Stockham Ex. 87). This is true because the job classification (skill-rating) system does not take into account the incentive pay system. Many incentive workers in job classes 2 through 9 have higher actual earnings than the non-incentive workers of job classes 10 through 13. (Stockham Ex. 87)

55. In 10 of the 22 seniority departments at Stockham unadjusted black gross earnings exceeded unadjusted white gross earnings and in 9 of the 22 seniority departments unadjusted black hourly earnings exceeded unadjusted white hourly earnings.[1] (Plaintiffs' Ex. 11)

56. Of Stockham's hourly production and maintenance workers, 50 whites and 25 blacks earned more than $9,000 in 1972. Of the 74 persons earning more than $9,000 in 1972, 32 were in job class 13; 3 in job class 10; 5 in job class 9; 1 in job class 9(b); 9 in job class 8(b); 1 in job class 7(b); 1 in job class 6; 6 in job class 6(b); 3 in job class 5; 8 in job class 5(b); 3 in job class 4(b); and 3 in job class 3(b). (Stockham Ex. 87) No job class 11 or 12 workers in the entire plant earned more than $9,000 in 1972.

57. Of Stockham's 15 production and maintenance workers earning $10,000 or more in 1972, 12 were white and 3 were black. (Stockham Ex. 87) Three of the 12 white employees held the job of annealing oven operator (job class 13), a job which the evidence showed had not been vacant since the effective date of Title VII.

58. Of Stockham's 15 production and maintenance workers earning $10,000 or more in 1972, 8 were in job class 13; 2 in job class 10; 1 in job class 9; 1 in job class 8(b); 1 in job class 6(b); 1 in job class 5; and 1 in job class 3(b). (Stockham Ex. 87)

59. Plaintiffs failed to show that any stratification in pay on the basis of race exists at Stockham, and failed to show that blacks were not working in the higher paying jobs within the plant.

B. Stockham's Personnel Development Program

1. The first personnel development class was begun in January, 1960; the second class in May, 1962; and the third class in September, 1966. (Plaintiffs' Ex. 41)

2. Stockham began a period of rapid growth in the 1960's and by 1969 the need for the Personnel Development program increased greatly. Prior to 1969, the program was informal, unstructured and only infrequently used.

3. Blacks have participated in the Personnel Development Program. (Stockham Ex. 51A and B)

4. There is an allocation of positions in the personnel development program among the departments at Stockham and final selection of participants is made by the superintendents.

5. The 1969 Training Committee expected the Personnel Development Program to provide as many as sixty future supervisors during the 1970's. (Plaintiffs' Ex. 43)

6. The Personnel Development Program is a plantwide program and involves only 14 participants per year.

7. Participation in the Personnel Development Program does not insure that a participant will become a first-line supervisor. (Stockham Ex. 51A and B)

8. Some of the purposes of the Personnel Development Program are to afford employees with growth potential, an

---

1. Plaintiffs listed four departments that are not bargaining unit seniority departments.

opportunity to learn, to make a greater contribution, and to advance.

9. One of the purposes of the Personnel Development Program is to afford participants some knowledge of the operations in departments other than those in which they have been employed.

10. The Personnel Development Program is designed to reach outstanding salary and hour rated employees to provide them with a better overall knowledge of Stockham and point out avenues for career planning.

11. Stockham's Personnel Development Program is important to the safe and efficient operation of Stockham's plant.

12. Upon a preponderance of the evidence the Court finds that the Stockham Personnel Development Program did not discriminate against plaintiffs or the class or classes plaintiffs represent.

C. Stockham's Management Training Program

1. The Management Training Program was instituted in its present form in 1969. (Stockham Ex. 51A and B)

2. Prior to 1969, the Management Training Program was designated as the "Organizational Apprentice Program." (Stockham Ex. 51A and B)

3. Stockham began a period of rapid growth in the 1960's which led in 1969 to the establishment of the Management Training Program.

4. One of the purposes of the Management Training Program is to expose participants to a number of different departments of the Company.

5. Another purpose of the Management Training Program is to provide Stockham an adequate supply of technically trained college graduates who can contribute to and grow within Stockham's operation.

6. A primary purpose of the Management Training Program is to train college graduates to fill key supervisory and management positions. (Stockham Ex. 51A and B)

7. Participation in the Management Training Program or its predecessor, does not automatically insure that the participant will obtain a supervisory or management position. (Stockham Ex. 51A and B)

8. The 1969 Training Committee expected the Management Training Program to provide a minimum of 35 college graduates to fill key supervisory and management positions during the 1970's. (Plaintiffs' Ex. 43)

9. The Management Training Program has always been open to persons of all races and at least one black person has been recruited for and has participated in the program.

10. Participants in the Management Training Program do not come from within Stockham's current work force, but are recruited primarily from scientific and technological colleges and universities, all of whose student enrollments are racially integrated.

11. Because of the continuing need of Stockham for highly trained, technically-oriented management personnel, the Management Training Program is important to the safe and efficient operation of Stockham's plant.

12. Upon a preponderance of the evidence, the Court concludes that Stockham's Management Training Program does not discriminate against plaintiffs or the class or classes plaintiffs represent.

D. Stockham's Apprentice Training Program

1. The apprentice training program at Stockham is a dual educational experience involving completion of academic courses and on-the-job training. (Stockham Ex. 51A and B)

2. Stockham has never maintained any policy that the apprentice program is open only to white employees or applicants. In addition, there has never been a policy of excluding blacks from craft jobs.

3. The most efficacious, economical, and efficient means to prepare employees for highly skilled and craft jobs at Stockham is through the apprentice training program.

4. The primary purpose of the apprentice training program is to develop sufficient competent journeymen in each craft specialty to meet present and future needs of Stockham.

5. The number of apprentices in the apprentice training program at Stockham at any one time is determined by the need for apprentices in any particular field and the availability of skilled people to provide on-the-job training for apprentices in that particular field.

6. Prior to 1969 Stockham's need for apprentices was small. Stockham began a period of rapid growth in the middle and late 1960's and in 1969 recognized the need for a greater number of apprentices.

7. The apprentice training program at Stockham is a demanding, four-year program. It involves a short-range sacrifice in earnings for the prospect of future advancement in not only earnings but also responsibility and prestige. The apprentice training program involves approximately 9,000 hours in Stockham's shops and apprentice classes. The apprentice attends classes for two hours each day, two days per week in addition to his normal working hours. (Stockham Ex. 51A and B)

8. The apprentice is paid for the time he spends in class and his rate of pay depends on the number of hours in the apprentice training program he has completed. (Stockham Ex. 51A and B)

9. The academic course work is completed through the International Correspondence Schools, whose business office is located in Scranton, Pennsylvania. When an employee enters the apprentice training program, he must make an initial payment of $60.00 to International Correspondence Schools, and employees in the apprentice training program pay $25 per month to International Corre-

spondence Schools for academic materials. (Stockham Ex. 51A and B)

10. During the on-the-job training portion of the apprentice training program, an apprentice develops considerable skills which could not be obtained from books by working with and under the guidance of journeymen in the trade he is following.

11. An apprentice must sign a written agreement (apprentice contract) to work at, and learn the trade of a craft specialty mutually agreed upon by the employee and Stockham. (Stockham Ex. 51A and B)

12. Apprentices are full-time employees of Stockham. (Stockham Ex. 51A and B)

13. The three sources of personnel for the apprentice training program are employees filing timely applications, employees who demonstrate exceptional ability and who are recommended by supervisors, and individuals employed from outside Stockham. (Stockham Ex. 51A and B)

14. All apprentices, whether old or new employees, are on probation for the first four months of their apprentice training. (Plaintiffs' Ex. 37)

15. A prospective apprentice must have a genuine desire to follow a particular trade, he must have an aptitude for that trade, and he must already possess some degree of skill in that trade. He must be reliable and have a good attendance record.

16. An individual with experience related to the job specialty he is pursuing may be granted advanced standing in the apprentice program. (Plaintiffs' Ex. 38) The evidence shows that advanced standing has been granted for both black and white employees.

17. Upon the successful completion of each 1,000 hour period of the apprentice training program, there is an automatic pay increase. (Stockham Ex. 51A and B)

18. From 1965 to 1970, the starting minimum wage for an apprentice was

roughly equivalent to the base rate in job classes 5 or 6. In 1971, through 1972, the starting minimum rate for an apprentice was roughly equivalent to the base pay for job classes 6 or 7. In 1973, the starting minimum rate for an apprentice was roughly equivalent to the base rate for job classes 7 or 8. (Stockham Ex. 59) The increase reflected was part of the effort by Stockham to make the program more attractive to all employees.

19. An apprentice must be at least 18 years of age. (Stockham Ex. 51A and B)

20. Although generally an apprentice must be no older than 30 years of age (time in the military is not computed) at the time of signing the apprentice agreement, a waiver of the age requirement can be granted by the Industrial Relations Manager. (Stockham Ex. 51A and B; Plaintiffs' Ex. 38)

21. The evidence shows that the age requirement is not automatically applied. Since 1965 the age requirement for apprentices has been waived on 4 occasions; 3 times for white employees and once for a black employee.

22. Under the old apprentice contract there was no specific educational requirement (Plaintiffs' Ex. 36), but presently all applicants for apprenticeships generally must have a high school diploma or the equivalent of G.E.D. certificate. (Plaintiffs' Ex. 37)

23. The evidence shows that the educational requirement is not automatically applied. Since 1965 the high school education level requirement for the apprentice program has been waived on 4 occasions, 3 times for white employees and once for a black employee. (Stockham Ex. 60)

24. The evidence fails to show that the age and education requirements generally applicable have had an adverse impact on plaintiffs, or the class or classes plaintiffs represent. In addition, the evidence did not show that employees presently holding the craft jobs to which the apprenticeship program may lead generally lack a high school education.

25. To be considered for apprentice training a person in any department need only file a timely application.

26. Prospective apprentices may file timely applications or be selected by superintendents and approved by the apprentice committee.

27. No black employee filed a timely application for an apprentice job until 1971. (Stockham Ex. 76)

28. The apprentice committee has discussed ways to make the apprentice program more attractive to black employees. It has publicized the program to a greater extent, recommended that the pay rate be made more attractive, and recommended that a bonus be paid upon successful completion of the program. A bonus of $400 is given each apprentice upon completion of the apprentice training program. (Plaintiffs' Ex. 38)

29. A total of 101 individuals have entered the apprentice program since July 2, 1965. Of that total 6 were black employees. (Plaintiffs' Ex. 12A)

30. From 1965 through 1973, a total of 65 timely applications for apprentice positions were filed, 14 by black and 51 by white employees. Of that total 38 were granted, 6 for black and 32 for white employees. (Stockham Ex. 64)

31. Stockham's Apprentice Training Program is important to the safe and efficient operation of Stockham's plant.

32. Upon a preponderance of the evidence, the Court concludes that Stockham's Apprentice Training Program did not discriminate against plaintiffs, or the class or classes they represent.

### E. Supervisors

1. The department superintendent is responsible for selecting individuals to fill supervisor vacancies within the department. He does not consult with other foremen but does consult with higher

management. Foremen have no role in the selection of other foremen.

2. When a supervisor opening occurs, the department superintendent selects from two to five candidates for the job and consults with the manager of production about who will be selected. The criteria for selection of foremen include who is the best man for the job at this particular time based upon such factors as: desire to be a foreman; work performance record; leadership qualities; job knowledge; physical fitness; common sense and good judgment; work habits; dedication to the job; loyalty; and, enthusiasm.

3. There is a relatively low turnover rate among supervisory personnel; the need to select superintendents is rare.

4. In addition to the other criteria for selection of supervisors there is a psychological evaluation performed by a consulting industrial psychologist which is considered.

5. There are 26 foremen working in the Grey Iron Foundry. Two are black and more than half of the 24 white foremen had worked in the Grey Iron Foundry prior to becoming foremen.

6. From 1965 through 1973, there were a total of 12 timely applications for supervisory positions, 9 by black and 3 by white employees. Of that total, 2 have been granted, 1 for a black and 1 for a white employee. (Stockham Ex. 77)

7. Of the 120 persons listed on plaintiffs' Exhibit 11 as foremen, 40 were promoted to foreman positions prior to July 2, 1965. 47 persons were promoted to foreman positions after January 1, 1970, and 5 of those individuals were black. (Plaintiffs' Ex. 11)

8. The position of foreman at Stockham is a salaried, management position outside the purview of the bargaining agreement.

9. The evidence in the record does not reflect that a single qualified black employee was denied a supervisory position in favor of an equally or less-qualified white employee.

### F. Sales and Clerical Jobs

#### Clerical Jobs

1. Approximately 20 clerks of the total clerical work force of 140 are black employees.

2. There have been few clerical job vacancies since 1965 and numerous timely applications for clerical jobs. (Stockham Ex. 65)

3. From 1965 through 1973, there were 201 timely applications for clerical positions, 67 by black and 134 by white employees; of that total 26 were granted, 6 for black and 20 for white employees. (Stockham Ex. 63)

4. If more than one applicant for a clerical position meets the general and specific criteria for the job, the best qualified man is selected for that job.

5. The plant clerical jobs are salaried jobs and are not covered by the collective bargaining agreement.

6. Each of the plant clerical positions at Stockham requires aptitudes and capabilities which differ from those required for most of the production jobs at Stockham.

7. The following general criteria are employed in evaluating employees for plant clerical positions: good attendance record; good work record; ability to read and do simple arithmetic; legible handwriting; ability to do simple reports; willingness to work on any shift; average or above average merit ratings; and, being physically qualified for the job. In addition to these general criteria there are other criteria required for each specific clerical job.

8. The Truck-loading Clerk in the shipping department must be able to recognize the approximately 19,000 finished products manufactured by Stockham. This ability to recognize products is acquired over a period of time by working in the Shipping Room picking orders and assembling them for shipment.

9. The clerical jobs called Re-Inspector, 5610 Clerk, and Finished Stock Dispatcher require familiarity with thousands of products manufactured at Stockham. This familiarity is developed by working with these products over an extended period of time.

10. The job of Carton and Stock Dispatcher, in addition to the general criteria for clerical positions, requires familiarity with the thousands of products produced at Stockham and leadership ability. The Carton and Stock Dispatcher must direct the men who work under him.

11. The Inventory Clerk, in addition to the general criteria for clerical jobs, must be familiar with the thousands of products produced by Stockham.

12. The Valve Parts Coordinator in the Receiving department, in addition to the general criteria for clerical jobs, must be able to type 25-30 words per minute and use a calculator.

13. In the Receiving department, there are clerical jobs of Counter Clerk, Junior Receiving Clerk, Receiving Clerk, Senior Receiving Clerk, and Raw Materials Clerk. An employee must hold the job of Counter Clerk before he can move into any of the other positions. An employee must hold the job of Senior Receiving Clerk before he can move to the job of Raw Materials Clerk.

14. The Dispatching department issues line-ups throughout the Stockham plant to ensure an orderly process of manufacture. There are clerical employees in this department known as Schedulers. Schedulers assist Dispatchers in making out line-ups and in ascertaining that production departments are following the line-ups. In addition to the basic clerical qualifications, Schedulers must have a knowledge of the thousands of products produced at Stockham. This knowledge is obtained over a period of time in working with the various products.

15. The Dispatcher in the Dispatching department is responsible for seeing that the proper material is lined up in the proper manner and run to maintain product flow. The Dispatcher exercises direction over other employees, including the Schedulers. Having held the job of Scheduler is a pre-requisite to moving to the job of Dispatcher.

16. An employee holding the job of Timekeeper or Time Checker in the Industrial Engineering department, in addition to the general prerequisites for a clerical position, must be bondable.

17. The Production Checker in the various Inspection Departments must be thoroughly familiar with the products of the Stockham plant—a familiarity which can only be acquired over a considerable length of time, and which is usually acquired by working in the Inspection department inspecting the various products as they are manufactured.

18. An employee in a clerical job cannot gain the knowledge of the products produced at Stockham necessary to carry out his clerical job while he is performing the clerical job. To be qualified for a clerical job, an employee must already be familiar with the products of the Stockham plant at the time he first assumes the clerical position. Hourly employees in the Shipping Room learn a great deal about the products at Stockham, but employees who work in the Receiving department learn little, if anything, about Stockham's products.

19. The hourly employees in the Receiving department do not obtain the kind of familiarity with the steel castings purchased by Stockham from outside sources requisite to the performance of clerical duties simply by handling such items with fork lifts and on pallets. The incoming castings are inspected and the receiving records for these castings are made by employees in the inspection department.

20. The evidence does not show that a qualified black employee ever applied for a clerical job and was "passed over" in favor of an equally or less-qualified white employee.

*Sales Jobs*

21. The evidence reflects that the only black applicant for a clerical position in the Stockham sales department was hired by Stockham for such position.

22. Production or maintenance experience in the plant does not qualify a person for a job in the sales department.

23. There are approximately 22 people in the sales department at Birmingham.

24. There is only one salesman at Birmingham and he is white. Only one black employee has ever applied for such job; this applicant, the evidence reflects, did not have a good work record and his prior experience was limited to work as a porter and busboy.

25. A good prospect for a Stockham sales position is highly motivated toward a sales career; is willing to transfer anywhere in the country; and preferably has previous sales experience and/or a college education with a major in marketing or business administration and some engineering background.

26. There is no evidence that a qualified black representative of the class ever applied for a job in the Sales department and was "passed over" in favor of an equally or less-qualified white employee.

### G. Facilities at Stockham

#### (i) General

1. On or about June 24, 1965, Stockham by written notices advised its employees that Stockham would comply with Title VII of the Civil Rights Act of 1964. (Stockham Ex. 51A and B)

2. It is and has been Stockham's announced policy that the facilities at the plant were and are available for use by all employees. (Plaintiffs' Ex. 61)

3. Stockham maintains at its own cost and expense free medical and dental facilities, for the benefit of its employees without regard to race. (Stockham Ex. 51A and B)

4. The use of the dispensary, water fountains, time clocks, pay windows, and the assignment of identification badges have been conceded by plaintiffs not to present discrimination issues in this case.

5. During the relevant period involved in this case, Stockham has not maintained separate entrances, badge numbers, time clocks, card racks, or water coolers for black and white employees. (Stockham Ex. 51A and B)

6. All buildings and other facilities contructed by Stockham since July 2, 1965 which contain water coolers, restrooms, lockers, or showers provide common facilities used by both black and white employees without regard to race. (Stockham Ex. 51A and B)

#### (ii) YMCA

7. The YMCA at Stockham is a Company-sponsored, employee-services program. The YMCA program, established in 1918, derives its entire support from Stockham. (Plaintiffs' Ex. 61)

8. The various functions and activities of the YMCA at Stockham have been conceded by the plaintiffs not to present discrimination issues in this case.

#### (iii) Stockham's Conciliation Efforts

9. After the plaintiffs filed their charges with the EEOC, Stockham attempted to conciliate the facilities issue with EEOC representatives on numerous occasions. After plaintiffs instituted suit, Stockham continued its conciliation efforts. Plaintiffs' charges were referred to conciliation by the Court on Stockham's motion in September, 1971. Thereafter, the evidence reflects that in September, 1971 Stockham officials met with the chief conciliator of EEOC in Birmingham; and in January, 1972 met with him again in Birmingham for conciliation purposes. In February, 1972, Stockham officials went to Washington for a scheduled appointment but the EEOC representative was not there. A meeting was arranged by Stockham but not kept by the chief conciliator of

**481**

EEOC in April, 1972. Stockham met with EEOC officials again in Washington in August, 1972. In December, 1972 Stockham officials met with the Deputy General Counsel of the EEOC in Washington, but received no further communication from the EEOC on the plaintiffs' charges. The Court finds that Stockham was actively seeking to conciliate the facilities issue at all times relevant to this action.

10. Conciliation efforts by Stockham again began in February 1973, on an unfair employment practice charge not involved in this case. Such efforts proved successful, Stockham entering into a written agreement with the EEOC with respect to facilities, on January 21, 1974. (Stockham Ex. 34)

11. Under the Stockham-EEOC conciliation agreement Stockham agreed to: (1) revise and rearrange its restroom facilities in the shipping room, valve shop south, brass building, malleable foundry and tapping room; (2) eliminate a portion of a wall in the main bathhouse and to reassign all lockers; (3) remove the partition in the cafeteria; and, (4) conduct the YMCA programs under the management and direction of the single YMCA Board. Stockham further agreed that all construction contemplated by such agreement was to be complete by August 31, 1974, and that notice of the availability of all facilities and activities without regard to race was to be posted. (Stockham Ex. 34)

12. Plaintiffs have failed to establish from the evidence adduced, the existence of any allegedly discriminately maintained facility in the Stockham Plant which was not the subject of the Conciliation Agreement of January 21, 1974. There are two female restrooms which are located in the dispensary and not mentioned in the Conciliation Agreement, with respect to which Plaintiffs have failed to establish racially discriminatory practices.

13. Since December, 1973 there has been one YMCA Board consisting of nine whites and nine blacks.

14. Black and white employees utilize all eating facilities at Stockham.

## H. Stockham's Employment Testing Practices

### Testing Prior to 1965

1. Throughout the 1950's Stockham experimented with a variety of different aptitude tests for use in various employment situations.

2. At least since the middle 1940's Stockham has had a continuing relationship with Dr. Otis McMahon, consulting psychologist, who evaluates candidates for "key" management positions utilizing aptitude testing and other tools. Specifically, an aptitude test battery has been utilized by Dr. McMahon to screen candidates for the Management Training Program and its predecessor, the Organizational Apprentice Program.

3. In 1953 Stockham began administering the Bennett Mechanical Comprehension Test to screen candidates for its apprentice program. A clerical test has been utilized to screen candidates for clerical positions.

4. Stockham did not require a more comprehensive aptitude testing program until the middle 1960's when it began expanding and, concurrently, selection problems became more difficult.

### Testing Practices Between August 1965 and April 1971

5. In August 1965, Stockham implemented a testing program—for initial employment, promotion or transfer—utilizing the Wonderlic Personnel Test. According to Dr. Barrett, who reviewed Stockham's use of tests in 1968, the Wonderlic test is an "old and popular test" (Stockham Ex. 74) which "has long been recognized as a reliable measure of mental ability". (Plaintiffs' Ex. 14, p. 4)

6. The Wonderlic test was administered in order to provide an improved tool in selecting personnel.

7. At all times within this period, the Wonderlic test was administered in accordance with instructions in the Wonderlic Manual.

8. On October 7, 1966, Mr. Herbert Stockham formally adopted the standards set out in the Wonderlic Manual except for candidates for promotion within a department; · in that circumstance, the required score was significantly lower since the company had other evidence of potential (the employee's Stockham work record) to evaluate.

9. For applicants for employment and for applicants for transfer to jobs outside their department, the minimum eligibility scores on the Wonderlic were: wage classes 1–5—5; wage classes 6–8—15; wage classes 9–13—19; for promotions within a department the minimum eligibility scores on the Wonderlic were: wage classes 1–5—0; wage classes 6–8—8; wage classes 9–13—15.

10. For promotion and transfer of Stockham employees, factors other than test scores were considered: The employment record, merit ratings, and past production performance record reflecting adequate skills, knowledge, training, efficiency, and physical fitness to perform the job.

11. Applicants for apprentice jobs were required to score 18 on the Wonderlic; applicants for clerical positions were required to score 20 on the Wonderlic.

12. The Court finds no competent evidence in the record to demonstrate that the Wonderlic test, as administered at Stockham in the period from 1965 to 1971, had any adverse impact upon black applicants for employment, promotion or transfer.

(a) Plaintiffs rely upon a national survey, *Negro Norms*, which states: "A very stable differential in raw scores achieved by the Negro applicant population exists". That differ-

ence nationally is approximately eight points. (Plaintiffs' Ex. 14, p. 3)

(b) Both plaintiffs' and defendant's expert testing witnesses testified that this survey cannot be reliably used to draw any conclusions with respect to the administration of the Wonderlic test at Stockham since, quite possibly, scores of blacks and whites at Stockham may well have been substantially different from those reported in *Negro Norms*. The Court finds the Wonderlic survey is not probative of test performance of Stockham employees, and it does not constitute competent evidence that blacks at Stockham failed to do as well as whites on the Wonderlic.

(c) The Equal Employment Opportunity Commission's Guidelines on Employment Selection Procedures do not sanction the use of validation evidence from other employers in preparing a validation study except in limited circumstances which plaintiffs have not demonstrated exist in this case. 29 C.F.R. § 1607.7.

(d) Dr. Barrett, plaintiffs' testing witness, performed management consultation services for Stockham with respect to its personnel practices in 1968. In that capacity, he proposed that the use of the Wonderlic test be studied to see if it had a racial impact, but he did not make any assumption that the Wonderlic would have an adverse impact upon blacks merely because it was a test of mental ability.

(e) Plaintiffs presented no evidence to the effect that the average score of blacks at Stockham on the Wonderlic test was any lower from the average score of whites at Stockham on the Wonderlic test; nor do plaintiffs offer any explanation as to why such a showing was impossible or unnecessary.

(f) The Court finds that the only evidence which even suggests a possibility that the mean scores of blacks and whites were different was the testimony of Dr. Joan Haworth, Stock-

ham's data processing expert, who testified that there was a difference between the scores of whites and blacks which she could not recall.

(g) Dr. Haworth's recollection is not useful since the data which she recalled was admittedly incomplete. Because of the incomplete data, the Court finds no competent evidence that the supposed difference (which Dr. Haworth recalled from her incomplete study) reflected an actual disparity between the scores of black and white Stockham applicants or employees in the period from 1965 to 1971.

(h) Plaintiffs failed to relate any supposed difference in test performance by blacks and whites to the Wonderlic cutoff scores actually utilized by Stockham from 1965 to 1971.

(i) During the period that the Wonderlic was administered, the percentage of black employees in the production and maintenance unit ranged between 67% and 72%. In 1972 (the calendar year immediately following the cessation of all testing at Stockham), blacks continued to constitute about 67% of Stockham's production and maintenance work force. No increases in percentage of blacks, which would have been anticipated if the Wonderlic had a disproportionate impact upon blacks, occurred as a result of discontinuance of the Wonderlic test as a condition of employment in April 1971.

(j) During the period that the Wonderlic was administered, 31.2% of black timely applications were granted, while 35.9% of white timely applications were granted.

(k) Black employees, in the period from 1965 to 1971, accounted for 63% to nearly 89% of all inter-departmental transfers.

(l) None of the personnel officials at Stockham recalled that the Wonderlic had a discriminatory effect upon black applicants or candidates for transfer or promotion.

(m) The Court finds no persuasive evidence in the record to the effect that blacks were disproportionately disqualified from employment, promotion, or transfer as a result of Stockham's use of the Wonderlic test; on the contrary, the evidence presented at trial wholly supports the finding made herein, that there was no discernable impact upon black employment opportunities attributable to the Wonderlic test.

13. In 1969 or 1970, Jack Adamson observed that black candidates for the apprentice program were not scoring as well as whites on the Bennett Mechanical Comprehension test.

14. Mr. Adamson discussed the difficulty which blacks were having with the Bennett test with Stockham's consulting psychologist and the cutting score for blacks on the Bennett test was lowered from 45 to 35. White applicants still were required to score 45 on the Bennett Mechanical Comprehension test to qualify for the apprenticeship program.

15. Stockham ceased all employment aptitude testing in April 1971 and did not undertake the use of any employment aptitude tests thereafter, other than the Tabaka tests, hereafter described.

### The Tabaka Tests—The Validation Study

16. In early 1973, Stockham retained the management consulting firm of Victor Tabaka & Associates, Inc. to develop a testing program to assist it in employee selection. Thereafter, Mr. Tabaka and his staff undertook a study to identify and validate those selection tests which appeared to show promise of validation in specific job applications.

17. The approach which Mr. Tabaka utilized was a concurrent, criterion-related validation study. That is, Mr. Tabaka identified the relevant criteria for success on the jobs subject to study; obtained ratings on the relevant criteria from first line supervisors of employees subject to the study; selected and ad-

ministered aptitude tests, which measured the traits in question, to the subject employees; and, utilized standard statistical techniques to determine whether the test score had any statistically significant relationship to the supervisor's ratings on the success criteria.

18. The concurrent, criterion-related validation method is an acceptable approach under both the Equal Employment Opportunity Commission's Guidelines on Employment Selection Procedures and the American Psychological Association's Standard for Educational Tests and Manuals.

19. The principal advantage of a concurrent validation study, as opposed to a predictive validation study, is that it permits validation to be completed reasonably promptly and does not require an employer to waive existing hiring standards in order to obtain subject employees; the disadvantage of a concurrent validation method is that the subject pool is restricted, in that the test is not administered to persons who were not employed, or persons who, because of their ability, have been promoted to higher positions. This phenomenom, known as restriction in range, results in an understatement of the relationship between the test and the success criterion.

20. The Court finds that Mr. Tabaka undertook the study with a great deal of care, and utilized independent consultation to verify his approach.

(a) Prior to and during the study, Mr. Tabaka discussed the proposed undertaking with Dr. William Enneis, a testing expert with the Equal Employment Opportunity Commission.

(b) Mr. Tabaka also consulted with Dr. Jan Mize, a statistician at the Georgia State University, with respect to the statistical techniques which he utilized.

(c) Dr. Mize also selected six studies at random and recomputed the mathematical calculations.

21. Prior to beginning his study, Mr. Tabaka toured the manufacturing facility at Stockham in order to become generally acquainted with its varied production and maintenance operations.

22. Mr. Tabaka carefully reviewed written Stockham job descriptions for hourly-rated jobs to aid in assessing job content.

23. In circumstances where Mr. Tabaka had any question as to job content, he personally observed the job; and, frequently, he discussed job content with the employee who actually performed the job.

24. Thereafter, Mr. Tabaka prepared his "Job Qualififcations Form" and distributed it to supervisors who were familiar with the job to obtain their judgment as to performance characteristics necessary for adequate job performance.

25. With the job content thus catalogued, Mr. Tabaka screened the positions to determine those which would be suitable for inclusion in his validation study. He employed two criteria: (a) the kind of skills and ability required in the job had to offer promise of being tested with a paper and pencil test; and (b) the job had to have a sufficient number of incumbent employees under a single supervisor to permit statistical comparison.

26. After selecting jobs which offered promise for test validation, Mr. Tabaka obtained performance ratings from first-line foremen who had day-to-day contact with the subject employees.

27. Mr. Tabaka personally met with the prospective raters to ascertain that they were properly instructed:

(a) Prior to rating any employee, the rater had to have first-hand knowledge of employee performance in the trait in question.

(b) Additionally, if the rater believed that the trait in question was not essential for job performance, Mr. Tabaka eliminated that characteristic.

(c) Each rater received written instructions with respect to the traits which he was to rate.

(d) Mr. Tabaka cautioned the raters about the "halo effect" (a phenomenon in which strong positive or negative characteristics in one area tend to influence judgment as to other areas), which would bias the performance ratings.

(e) Mr. Tabaka asked the raters to rank each of their employees with respect to each performance characteristic. Thereafter, the raters were asked to evaluate their employees on a quantitative objective scale.

(f) Where the rater ratings and the rater rankings were in conflict, Mr. Tabaka rejected the particular rating.

28. Mr. Tabaka administered the five tests which constitute the Tabaka Test Battery (coordination test, space visualization test, personnel placement test, arithmetic test and the Bennett Mechanical Comprehension test) to the subject employees.

29. Mr. Tabaka personally observed test administration and he judged that he obtained cooperation from the subject employees.

30. Mr. Tabaka removed the tests to his offices in Atlanta, where they were scored by his staff.

### Statistical Techniques

31. In analyzing the Stockham data three statistical correlation techniques were utilized—the Pearson Product Moment Correlation Coefficient Formula, the Chi-square array method and the Phi coefficient.

32. The Pearson Product Moment Correlation Coefficient Formula was the correlation method relied upon in the Tabaka study for the purpose of determining whether to use a test.

33. The Chi-square method was also utilized for correlation analyses, but it is undisputed that this technique was supplemental only; a Chi-square result did not form the exclusive basis for a recommendation to use, or not use, any particular test.

34. The Phi Coefficient formula was used to correlate data generated from the small samples of black employees.

35. Mr. Tabaka judged each correlation result by probability tables to ascertain whether they were statistically significant. He employed the Equal Employment Opportunity Commission's definition of statistical significance, i. e., that there may be no more than one chance in twenty that the derived correlation coefficient could have been obtained by chance.

36. Mr. Tabaka also analyzed the validity of the tests for black employees separately in those cases where there was a sufficient number of subject employees.

37. Although there were frequently few blacks in the high skilled jobs (for which blacks were generally not qualified), Mr. Tabaka testified: "It was a question as to whether we ignore those groups or whether we make a calculation based on what was available and we felt it was worthwhile to get a start by taking the persons who are available."

38. In each case where Mr. Tabaka obtained a statistically significant coefficient of correlation, he established a failure probability score by the array which he also used to calculate Chi-square.

39. On the basis of the separate correlation calculations for blacks, Mr. Tabaka established a separate failure probability score for blacks where indicated. Additionally, where Mr. Tabaka was unable to obtain a statistically significant correlation for blacks, he did not recommend the use of a particular test for blacks even where the test was recommended for whites seeking the same job.

40. Mr. Tabaka recommended that Stockham continue to accumulate additional data for supplemental validation purposes.

## The Use of the Tabaka Tests

41. The Tabaka tests have been in use at Stockham since July 17, 1973.

42. As of trial, no employee had been disqualified for promotion, transfer or employment on the basis of failing to attain the Failure Probability Score on a Tabaka test.

43. The Tabaka tests are actively considered in selection decisions; however, no employee has been disqualified on the basis of the Tabaka tests, even though some have failed to attain the failure probability score.

44. The Court finds that Stockham does not interpret test scores mechanically, and that testing simply provides another source of information with respect to a candidate for a particular job.

## The Expert Testing Testimony

45. Both plaintiffs and Stockham presented expert testimony with respect to the Tabaka validation study. Dr. Richard S. Barrett, an industrial psychologist, testified for plaintiffs, while Dr. Philip Ash, also an industrial psychologist, testified for Stockham.

46. Dr. Barrett has appeared on behalf of plaintiffs in 31 employment discrimination cases prior to this one; on no occasion has Dr. Barrett testified on behalf of an employer in an employment discrimination case.

47. Dr. Ash has testified with respect to testing issues for both plaintiffs and defendants in employment discrimination cases. Dr. Ash has also served as a consultant to the Office of Federal Contract Compliance and the United States Equal Employment Opportunity Commission in connection with the development of regulations setting out standards for appropriate test validation.

48. Dr. Barrett was employed by Case & Co., a management consulting firm, in 1968 when Case & Co. was retained to consult with Stockham about its personnel practices.

49. Dr. Barrett visited Stockham on several occcasions while he was employed at Case & Co. In 1968, he also made a proposal to Stockham to review its testing practices but his proposal was rejected.

50. In the course of his testimony, Dr. Barrett was called upon to testify upon the materials which he had reviewed and commented upon in the course of his management consultation services with Stockham.

51. In his testimony, Dr. Barrett criticized the format of Mr. Tabaka's report, claiming that it should be judged by the APA's "Redbook" and the Equal Employment Opportunity Commission's Guidelines concerning the presentation of validation evidence.

52. Dr. Ash did not concur with Dr. Barrett's judgment. He testified that the Redbook was "totally inapplicable" and that Mr. Tabaka's report was completely acceptable for the purposes for which it was prepared, and the Court so finds.

53. The Court also finds that the report, in conjunction with Stockham's answers to interrogatories and all work papers (which were made available to plaintiffs for inspection under protective order), provided ample opportunity for Dr. Barrett to assess the study in as much detail as he deemed warranted.

54. Dr. Barrett also criticized the selection of the performance criteria as "descriptions" of tests.

55. Dr. Ash disagreed, noting that in his judgment, the approach to the criteria was in the "upper 30% of the approaches to criterion development".

56. Dr. Barrett's criticism of the success criteria was not specific. He failed to support adequately his criticism, or to suggest an alternate approach which would have yielded more satisfactory success criteria. On the evidence in the record, the Court is convinced, and so finds, that Mr. Tabaka carefully analyzed job content and that the supervisors at Stockham assessed aptitudes which were necessary to meet the requirements of the job. Accordingly, the Court finds that the success cri-

teria are entirely adequate for purposes of the validation study.

57. Dr. Barrett challenged the results of all the correlation computations which Mr. Tabaka performed in those cases where the subject pool was twenty or less. This amounted to 26 of the some sixty separate correlation computations. Of those 26, seventeen studies involved subject pools which ranged between twenty and sixteen.

58. The Court finds that the smaller the sample, the less stable the statistical result. However, the impact of a small sample is diminished somewhat by the fact that the "statistical significance" concept counterbalances sample size to a degree. That is, as the sample size becomes smaller, a much higher correlation coefficient must be obtained in order to achieve a satisfactory level of statistical significance.

59. The small subject pools of black employees had to be analyzed if Mr. Tabaka was to study black test performance independently in an effort to explore differential validity as apparently required by the Equal Employment Opportunity Commission's Guidelines. 29 C.F.R. § 1607.7(5).

60. Dr. Barrett did not completely reject Mr. Tabaka's use of the Pearson Product Moment Correlation Coefficient even where it was used with smaller samples.

61. Dr. Ash testified: "There is no algebraic, statistical or analytical reason for not computing a correlation coefficient on a sample that numbers four or more cases . . . ."

62. Dr. Barrett believed the use of the Chi-square technique wholly inappropriate where there were fewer than twenty subjects in the pool. Dr. Ash concurred in principle, but observed that the Chi-square provided a useful approximation in samples as small as ten or twelve.

63. With respect to the statistical techniques, Dr. Ash testified:

Well, I would say it's a little bit like somebody going out in the rain with a pair of rubbers and a raincoat and a hat and just to make sure, taking along an umbrella, and the umbrella may even have a couple of holes in it. Where the sample size was adequate, the computation of the Chi-square was proper, it didn't add information, it did not provide false information. Where the sample size was small, I will agree that it was uninterpretable in terms of the available Chi-square table. (T. Ash 2453–2454).

64. The Court recognizes the difficulty with the use of the Chi-square technique in those correlation calculations where there were fewer than twenty subjects. However, the Court finds that the Chi-square technique was not relied upon in making a recommendation to use or not use a test. All test recommendations are fully supported by a correlation coefficient arrived at by the Pearson Product Moment Coefficient. Accordingly, the Court finds that plaintiffs' criticism is of no practical consequence.

65. The Phi coefficient was used to ascertain the correlation in the samples of black employees. The Phi is a Pearson Product Moment Correlation under the situation in which the only values to be assumed by the variables are one and zero.

66. Dr. Barrett attempted to relate the Phi to Chi-square; Dr. Ash persuasively testified that the techniques were unrelated. He further testified that the reasons which make Chi-square unreliable for correlation studies of less than twenty subjects do not apply to Phi. The Court accepts Dr. Ash's testimony, and so finds.

67. At Dr. Ash's request, Mr. Tabaka prepared job expectancy tables utilizing the data in his validation studies. The job expectancy tables generally confirm the results obtained by the correlation studies.

68. In assessing the Tabaka study, Dr. Ash observed:

It is my intuition that the Tabakas have brought together here a good collection of data analysis techniques and they have done a job which is in the upper thirty percent of all the studies that have been submitted to the Government and others that are pure unadulterated garbage. So it may not be flattering to be only at the seventy percentile, but I think it provides a personnel management with a reasonable set of decision rules, that to the extent to which it was technically feasible the degree of differential validity has been explored on a tentative basis, that the approach to the criteria has been judicious, mindful of race or bias and halo, and has used techniques which are emerging, particularly the job element aptitude approach. (T. Ash 2478–2479).

Dr. Barrett made no comparable assessment.

69. Dr. Ash testified that Mr. Tabaka's validation study met the technical requirements set out in the Equal Employment Opportunity Commission's Guidelines. Dr. Barrett did not testify that Mr. Tabaka's study failed to meet those guidelines.[2]

70. On the basis of the evidence presented, weighing testimony presented by Drs. Barrett and Ash, as well as that of Mr. Tabaka, the Court finds that plaintiffs' criticisms of the validation study are not substantiated. The study, on the contrary, was explicitly constructed with the Equal Employment Opportunity Commission's Guidelines in mind and the expert evidence presented by Stockham is persuasive. Dr. Barrett, while perhaps knowledgeable, was plainly not as familiar with statistical techniques[3] as Dr. Ash and the Court

finds his criticisms less persuasive than Dr. Ash's detailed testimony rejecting them. The Court finds, accordingly, that the Tabaka tests have been properly validated.

71. Where the Court has been required to decide between the conflicting expert opinions of Dr. Ash and Dr. Barrett, it has credited Dr. Ash because it has found Dr. Ash's opinion to be better supported by the evidence presented. Nonetheless, it is also apparent to the Court, based upon the testimony, demeanor, the experts' backgrounds and previous testimony history, that Dr. Barrett's objectivity has been compromised by his close and sympathetic identification with plaintiffs' position.

72. The fact that Stockham is continuing to analyze data does not support a conclusion that the present study is inadequate. Indeed, it would appear prudent to the Court to continue to monitor test operation. However, Dr. Ash characterized the Tabaka tests as a good interim set of decisional rules and the Court, on the basis of the evidence presented to it, so finds.

73. Both plaintiffs and Stockham agree, and the Court finds, that aptitude testing, properly used, is a useful tool to assure that selection decisions are free from bias.

### I. Union Defendants

1. Local 3036 of the United Steelworkers of America has represented Stockham's production and maintenance employees at all times material to this action. Local 3036 is a subdivision of the international union, United Steelworkers of America.

2. One of the functions of Local 3036 is the representation of Stockham's production and maintenance employees in furtherance of their contract demands.

2. Dr. Ash's opinion with respect to Guidelines' compliance did not encompass § 1607.-11 ("disparate treatment"), which, as Dr. Ash testified, was a statement of "social policy", not scientific method.

3. Dr. Barrett was unable to define accurately the statistical concept of standard deviation; he attempted to define Phi as a function of Chi-square when it is a variant of the Pearson formula; and he was unfamiliar with some of the professional literature dealing with differential validity.

3. Since World War II, the majority of Stockham's employees and the union's members has been black.

4. The majority of the members of the Local 3036 grievance committee and Local 3036's officers have been black employees of Stockham since at least 1967.

5. The departmental seniority policies of Stockham were predicated upon collective bargaining agreements negotiated between Stockham and Local 3036, composed of a majority of black employees and each such contract was ratified or approved by the members of Local 3036 at a meeting of the membership called for that purpose.

6. There is no evidence as to the union defendants, or either of them, of overtly maintaining racially discriminatory policies vis-a-vis the employees of Stockham.

### III

### FINDINGS OF FACT WITH REGARD TO THE SPECIFIC ALLEGATIONS OF DISCRIMINATION OF THE INDIVIDUAL PLAINTIFFS

#### A. Individual Plaintiff Patrick James, Sr.

1. Patrick James graduated from Parker High School in 1939. He served in the United States Army until 1943 and received supply sergeant training. He completed a motion picture projection course and attended Booker T. Washington Business College in Birmingham, Alabama.

2. During the period from 1944 to 1946, inclusive, James attended Tuskegee Institute from time to time, but failed to complete a course of study. James completed the fall quarter in 1944, but failed to complete the winter quarter in 1944–45. He took one course in the summer of 1945 and attended Tuskegee in the fall of 1945, but failed to complete the fall quarter. He attended Tuskegee in the winter quarter of 1945–46, but failed to complete that quarter.

3. The certified transcript of James while he was a student at Tuskegee Institute reflects that James completed and received passing grades in three subjects, i. e., light and power wiring, mechanical drawing, and electricity; the transcript further reveals that James took and received failing grades in seven other subjects, i. e., Mathematics (twice), D. C. Circuits (twice), Mechanical Forum (twice), and English Composition. The certified transcript further reveals that Mr. James failed to successfully complete a single academic college-level course; that he was recommended for suspension for failure to attend classes, and that he was ultimately dropped from the rolls of Tuskegee Institute "because of poor scholarship" on December 20, 1945.

4. James held a number of jobs for short periods of time including jobs as a motion picture projectionist, insurance agent, porter at McGough Bakery, and porter and truck driver for Pizitz Department Store. He left each job after a short time in order to make more money. He came to Stockham in 1950 to make more money and he has remained at Stockham for approximately twenty-four years.

5. James initially worked as a laborer in the Malleable Foundry and after several interim jobs, he worked for approximately 20 years as a truck driver in the Receiving department.

6. James asked for and received a job as fork-lift operator in the Receiving department and the attendant pay increase.

7. Although James has generally received poor merit ratings, other black employees have received good merit ratings from the same supervisors who gave James poor ratings in the Receiving department. (Stockham Ex. 84 and 85)

8. James was reprimanded on numerous occasions for spending too much time away from his job and he was repeatedly warned about leaving his job early for the lunch break.

9. James was disciplined on several occasions by Stockham, and once was laid off for disciplinary reasons. James filed a grievance under the bargaining agreement claiming his layoff was unfair but the arbitrator ruled Stockham had acted properly.

10. James applied for a job as a receiving clerk in 1966 and later for a job as a second class electrician. Since April, 1972, when James filed a timely application for a clerical job in the Receiving department, there have been two vacancies, one filled by a black employee and one filled by a white employee.

11. James was offered an incentive pay job (one which pays a bonus for good effort) in the Brass Core Room, but he refused it.

12. James never applied for a job for which he was qualified and for which he was passed over in favor of an equally or less-qualified white employee.

13. James has been Vice-President of Local 3036 since 1967.

14. James encouraged his son, Patrick, Jr., to apply for a job at Stockham in 1971 or 1972 because James believed Stockham was a good place to work.

### B. Individual Plaintiff Howard Harville

1. Harville last worked at Stockham in May, 1970. He retired on medical disability in 1972, and currently receives a disability pension from Stockham.

2. Harville was employed by Belcher Lumber Company as a block setter (laborer) in a sawmill for 15 years. He came to Stockham in 1946 to make a better living.

3. Although he had no prior clerical experience, Harville applied for a job in the Shipping department. He worked for approximately 24 years as an arbor molder in the Grey Iron Foundry. It takes 3 to 6 months to learn to be an arbor molder and an arbor molder must spend approximately 2 to 3 hours a day in a kneeling position.

4. Harville never applied for a job for which he was qualified and for which he was passed over in favor of an equally or less-qualified white employee.

5. Harville had no formal education other than grammar school.

### C. Individual Plaintiff Louis Winston

1. Louis Winston is a high school graduate. He was employed by Stockham in 1964. He did not request any specific job when he applied for employment with Stockham and was assigned to the Galvanizing department.

2. Before coming to Stockham, Winston worked as a stockman for New Williams and Birmingham Trunk, two local retail establishments. He sought employment at Stockham to make more money.

3. Winston was transferred to the Electrical Shop to avoid being laid off in the Galvanizing department. His work and attendance records in both departments were very satisfactory. When he had the opportunity to go back to the Galvanizing department, he elected to stay in the Electrical Shop.

4. While in the Electrical Shop, Winston did more than his job required and he learned some of the functions and duties of electricians. Upon entering the Apprentice Program, Winston was given 2,000 hours credit in the Program in consideration for the knowledge he had gained while assisting and watching the electricians.

5. Louis Winston is presently in Stockham's Apprentice Training Program but he did not apply for the program until urged to do so by his foreman.

6. Winston assumed the office of Recording Secretary of Local 3036 in 1971.

7. Winston never applied for a job for which he was qualified and for which he was passed over in favor of an equally or less-qualified white employee.

## IV

### FINDINGS OF FACTS WITH REGARD TO RELIEF SOUGHT BY PLAINTIFFS

#### A. Injunctive Relief

1. The evidence in this case is clear that injunctive relief with regard to Stockham's seniority system, promotions and transfers at Stockham, and initial job assignment at Stockham is inappropriate because plaintiffs have failed to carry their burden of proof on their claim that black employees have been locked into a racial stratification in pay, jobs or departments. Interdepartmental transfers have occurred and the large majority of such transfers were by black employees.

2. The record establishes that injunctive relief with regard to Stockham's training programs is not proper because plaintiffs have failed to establish by a preponderance of the evidence that the selection procedures for these programs discriminate against black employees.

3. Injunctive relief with regard to the selection of supervisors is not appropriate in this case because plaintiffs have failed to establish by a preponderance of the evidence that Stockham takes racial considerations into account in the selection process.

4. The record establishes that injunctive relief with regard to facilities at Stockham is inappropriate and unnecessary because Stockham has fully demonstrated its willingness to comply with the law. Furthermore, Stockham's efforts to resolve this issue recently led to a conciliation agreement with the EEOC which, as a practical matter, has made plaintiffs' requests for relief in connection with facilities moot.

5. The evidence in this case is clear that injunctive relief with regard to assignment of black employees to craft and highly skilled jobs is not appropriate because no black employee qualified for such a job has been passed over in favor of an equally or less-qualified white employee.

6. There is no showing that any qualified black employee has been passed over for a job as a clerk, salesman, guard or timekeeper in favor of an equally or less-qualified white employee; hence, injunctive relief in this regard is not appropriate.

7. The Tabaka tests have not been used to discriminate against black employees and the Court finds a decree sanctioning the continued use of the Tabaka tests is appropriate in this case.

#### B. Back Pay

1. Plaintiffs and the class or classes they represent are not entitled to an award of back pay because the proof is clear that the plaintiffs and the class or classes they represent have suffered no tangible economic loss as a result of racial discrimination.

2. Plaintiffs and the class or classes they represent are not entitled to an award of back pay because they failed to prove they had suffered a tangible economic loss as a result of racial discrimination.

#### C. Attorneys' Fees and Costs

1. Plaintiffs and the class or classes they represent are not entitled to an award of back pay because the record is clear that Stockham did not discriminate against plaintiffs, or the class or classes they represent, because of race.

2. Plaintiffs and the class or classes they represent are not entitled to an award of attorneys' fees or costs because plaintiffs have failed to prove that defendant Stockham discriminated against plaintiffs, or the class or classes they represent, because of race.

#### D. Conclusion

1. Plaintiffs failed to prove the allegations of their complaint and the Court finds that the allegations of the complaint are not supported by the evidence of record in this action.

CONCLUSIONS OF LAW

A. JURISDICTION

1. This Court has jurisdiction over the subject matter of this lawsuit and jurisdiction over the parties thereto under Section 706(f)(3) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Civil Rights Act of 1866, 42 U.S.C. § 1981.

2. This Court has jurisdiction with respect to claims against the defendant unions under the National Labor Relations Act, 29 U.S.C. § 151 et seq.

3. Stockham Valves and Fittings is an "employer" within the meaning of Section 701(b) of Title VII, 42 U.S.C. § 2000e(b), and Local 3036, United Steelworkers of America, AFL–CIO and United Steelworkers of America are "labor organizations" within the meaning of Section 701(d) and (e), 42 U.S.C. § 2000e(d), (e).

B. THE CLASS

4. This action may be maintained as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure for purposes of resolving the allegations in plaintiffs' complaint.

5. The class represented by plaintiffs consists of all black hourly production and maintenance employees currently employed by Stockham and all black persons who have been so employed at Stockham from July 2, 1965 to the date of trial.

C. THE BURDEN OF PROOF AND THE USE OF STATISTICS

6. Plaintiffs, charging that their rights under Title VII and § 1981 have been violated, must prove the allegations of their complaint in order to prevail. Plaintiffs are required to prove by a preponderance of substantive evidence that Stockham and the defendant unions have intentionally engaged in unlawful employment practices in violation of Title VII. United States v. Jacksonville Terminal Co., 451 F.2d 418, 443 (5th Cir. 1971), cert. denied 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972); Dawkins v. Nabisco, Inc., F. Supp., 7 EPD ¶ 9348 (N.D.Ga.1973).

7. When racial discrimination in employment practices and conditions is alleged, plaintiffs must first establish a prima facie case of discrimination before the burden of producing evidence shifts to the defendant. Buckner v. Goodyear Tire & Rubber Co., 339 F. Supp. 1108 (N.D.Ala.1972), aff'd per curiam 476 F.2d 1287 (5th Cir. 1973); Boston Chapter, NAACP, Inc. v. Beecher, 371 F.Supp. 507 (D.Mass.1974).

8. The defendant may overcome the prima facie case by producing credible, contradictory evidence, but is not required to produce a preponderance of such evidence. The risk of nonpersuasion remains at all times on the plaintiffs. Ochoa v. Monsanto Co., 335 F. Supp. 53 (S.D.Tex.1971), aff'd per curiam 473 F.2d 318 (5th Cir. 1973).

9. Although plaintiffs may establish a prima facie case through the use of statistical comparisons and exhibits (provided such statistics show that the alleged discriminatory practices have had a substantial adverse impact on blacks), the inferences raised from the statistics are not conclusive proof of discrimination. Ochoa v. Monsanto Co., supra; Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir. 1972). Statistical evidence, while obviously probative, does not relieve this Court of its obligation to determine whether plaintiffs have established the truth of their allegations.

10. The weight to be given any inferences raised by statistics varies according to the correctness, completeness, and comprehensiveness of the figures proffered. United States v. Jacksonville Terminal Co., supra; Hester v. Southern Ry., 497 F.2d 1374 (5th Cir. 1974). The complexities and variables of statistical evidence require close scrutiny of empirical proof. Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 230 n. 44 (5th Cir. 1974).

11. The defendant in a civil rights case by introducing evidence which explains his employment practices on the basis of legitimate, nonracial grounds may refute any inferences of discrimination raised by a plaintiff. *E. g.*, Buckner v. Goodyear Tire & Rubber Co., *supra*.

12. Once a defendant has adequately rebutted any inferences raised, the burden shifts back to a plaintiff to come forward with further specific evidence of the discriminatory impact of the challenged practices. Plaintiffs have the burden of augmenting their statistics with other evidence showing that whites received job assignments denied blacks, that jobs were available when blacks applied, and that blacks were passed over in favor of whites with equal or inferior qualifications. United States v. Jacksonville Terminal Co., *supra*; Buckner v. Goodyear Tire & Rubber Co., *supra*. Where plaintiffs fail to assume this additional burden, they also fail to carry their burden of proof on the case.

## D. INITIAL ASSIGNMENTS, PROMOTIONS AND TRANSFERS WITHIN BARGAINING UNIT (STOCKHAM'S SENIORITY SYSTEM)

13. Plaintiffs' assertion that Stockham discriminates on the basis of race in pay for blacks and whites is based essentially upon the fact that mathematically the average earnings of blacks at Stockham are slightly lower than those of white employees. Plaintiffs, however, have failed to adjust for, or even consider at all, in their simplistic earnings statistics, the established preference and productivity factors which determine individual earnings, and accordingly plaintiffs' statistics are so incomplete and inconclusive as to

raise no inferences of discrimination. See Roman v. ESB, Inc., 7 FEP 1063 (D.S.C.1971). Stockham has effectively demonstrated by evidence that plaintiffs' statistics in connection with earnings are "conflicting, equivocal, and probative of nothing." Ochoa v. Monsanto Co., *supra* at 59.

14. Based on the study made by Dr. James Gwartney of Stockham earnings and his testimony, this Court concludes that Stockham offers equal opportunities to blacks as far as earnings are concerned. This testimony is legally sufficient to prove that Stockham does not discriminate with respect to earnings between blacks and whites.[4]

15. Title VII of the Civil Rights Act of 1964 as amended, is not retroactive in effect and does not seek to punish an employer whose pre-July 2, 1965 employment practices, had they continued, may have violated its provisions. The Act, however, proscribes current employment practices to the extent they perpetuate the effects of past discrimination. United States v. St. Louis-S. F. Ry., 464 F.2d 301 (8th Cir. 1972), cert. denied, 409 U.S. 1116, 93 S. Ct. 913, 34 L.Ed.2d 700 (1973). A showing of historical pre-Act racial discrimination alone does not establish a per se violation of the Act and plaintiffs are required to establish a causal nexus between past discrimination which may have existed in Stockham's plant and the challenged present conditions of employment. Peters v. Missouri-Pac. R. R., 483 F.2d 490 (5th Cir. 1973).

16. This Court must focus its inquiry on the impact, rather than the specific present intent on the part of defendants, of an allegedly discriminatory criterion or practice. Plaintiffs must establish that the defendants meant to engage in the challenged practice although no specific intent to discriminate

---

4. Upon the basis of the evidence adduced in this case reflecting that blacks were among the highest wage earners in substantial numbers, this Court concludes that no stratification in earnings on the basis of race exists at Stockham. Compare Pettway v. American Cast Iron Pipe Co., *supra*; Brown v. Gaston County Dyeing Mach. Co., 457 F.2d 1377 (4th Cir. 1972) cert. denied, 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1973).

need be shown. Local 189, United Papermakers and Paperworkers AFL–CIO v. United States, 416 F.2d 980 (5th Cir. 1969), cert. denied 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970).

17. In analyzing an employer's promotion and transfer practices, the approach is in essence a search for artificial, arbitrary and unnecessary barriers to blacks who are qualified and seeking other jobs. Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). It must be shown that the promotion and transfer policies in fact do operate to "lock-in" qualified blacks seeking their rightful place.

18. Promotions and transfers at Stockham's facility are governed by the provisions of the collective bargaining agreement between the company and the defendant unions, and the seniority system established under this agreement is a unique form of departmental seniority. The maintenance by defendants of even a strict departmental seniority system in and of itself would not constitute a *per se* violation of Title VII. Heard v. Mueller Co., 4 FEP 1118 (E.D.Tenn. 1971), aff'd per curiam 464 F.2d 190 (6th Cir. 1972).

19. An absolute prerequisite to concluding that a departmental system violates the Act is a finding that employees were at one time assigned to seniority units on the basis of race. See Rodriguez v. East Texas Motor Freight, 505 F.2d 40, (5th Cir. 1975) (pattern of past discriminatory hiring is essential to plaintiffs' case); Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va. 1968); Swint v. Pullman-Standard, 8 EPD ¶ 9720 (N.D.Ala.1974). See also Franks v. Bowman Transp. Co., 495 F.2d 398 (5th Cir. 1974). Bare statistics showing only the racial composition of employees in departments does not—absent a study of the qualifications of applicants or at least a showing of examples in which qualified blacks were not assigned to certain departments—evidence discriminatory assignments. See Swint v. Pullman-Standard, *supra*. Since the seniority units at Stockham were established no later than 1950 and were developed because of functional, nonracial reasons, plaintiffs have failed to prove that employees at Stockham are now or ever have been assigned to departments on the basis of race.

20. In the leading cases decided under Title VII involving the problem of departmental seniority, there is an obvious, unarticulated assumption that blacks had definite incentives to transfer out of those departments which contained a high number of blacks. Typically a sharp contrast exists between the economic opportunities available in those departments which are predominantly black and those departments which are predominantly white; further there are typically demonstrably superior working conditions in those departments which are predominantly white. See e. g., Griggs v. Duke Power Co., *supra;* Waters v. Wisconsin Steel Works, 505 F.2d 1309 (7th Cir. 1974); Baxter v. Savannah Sugar Refining Corp., 495 F.2d 437 (5th Cir. 1974); Pettway v. American Cast Iron Pipe Co., supra; Johnson v. Goodyear Tire & Rubber Co., 491 F.2d 1364 (5th Cir. 1974); United States v. Jacksonville Terminal Co., *supra;* Local 189, United Papermakers and Paperworkers, AFL–CIO v. United States, *supra;* Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir. 1971); Quarles v. Philip Morris, Inc., *supra.* Plaintiffs have failed to prove that either of these two prerequisites exist at Stockham. Since there are equal earnings opportunities in almost all of the seniority units with no department or departments monopolizing the higher paying jobs, plaintiffs have failed to prove that Stockham maintains barriers to black employees desiring transfers between departments.

21. Although promotion decisions for bargaining unit jobs are made by supervisors, the procedures utilized by Stockham comply with the standards established by the Fifth Circuit in Rowe

v. General Motors Corp., *supra*. See also Swint v. Pullman-Standard, *supra*.

■ 22. A departmental seniority system violates Title VII only if it creates a barrier to qualified blacks seeking their rightful place. Plaintiffs have failed to establish that the unique seniority system at Stockham locks blacks into a "racial stratification in pay, jobs and departments." Pettway v. American Cast Iron Pipe Co., *supra*.[5] Plaintiffs failed to establish that black employees remain in certain departments because of a fear of losing accumulated seniority. Compare Rodriguez v. East Texas Motor Freight, *supra* (plaintiffs had "strong disincentive" to transfer); Johnson v. Goodyear Tire & Rubber Co., *supra;* Quarles v. Philip Morris, Inc., *supra*. There are, and have been at all relevant times, realistic opportunities to transfer between Stockham's departments for all employees.

■ 23. This Court, when confronted with plaintiffs' claims that blacks have been denied access to any given job or department, must consider the number of vacancies available subsequent to the effective date of the Act. Morrow v. Crisler, 479 F.2d 960 (5th Cir. 1973); rev'd on other grounds on rehearing en banc, 491 F.2d 1053 (5th Cir. 1974); Buckner v. Goodyear Tire & Rubber Co., *supra*. Plainly, racial discrimination in assignment to jobs or departments can occur only when the employer makes a selection decision incident to filling a vacancy. To the extent there have been no vacancies, there can be no such racial discrimination in violation of the Act.

■ 24. Congress did not intend in enacting Title VII to guarantee a job to every person regardless of qualifications.

"Congress has not commanded that the less qualified be preferred over the better qualified simply because of minority origins. Far from disparaging job qualifications as such, Congress has made such qualifications a controlling factor, so that race, religion, nationality and sex become irrelevant."

Griggs v. Duke Power Co., *supra*, 401 U.S. at 436, 91 S.Ct. at 856. The intent of Congress was to make the qualifications of competing individuals for any given job the controlling factor in promotion and transfer decisions, and an employer has the right to insist that an employee be qualified or competent to handle a particular job. See, *e. g.*, United States v. Jacksonville Terminal Co., *supra* at 445; Terrell v. Feldstein Co., 5 EPD ¶ 8039 (N.D.Ala.), aff'd 468 F.2d 910 (5th Cir. 1972); Wilson v. Woodward Iron Co., 362 F.Supp. 886 (N.D.Ala.1973). Necessarily, the relative competency and qualifications of competing employees are relevant factors in attempting to determine whether unlawful discrimination exists. Jenkins v. United Gas Corp., 400 F.2d 28 (5th Cir. 1968).

---

5. Employees at Stockham are not deprived of notice of job openings and are not totally dependent upon their supervisors for promotion and transfer consideration. Compare Baxter v. Savannah Sugar Refining Corp., *supra*; Franks v. Bowman Transp. Co., *supra*; Rowe v. General Motors Corp., *supra*; Brown v. Gaston County Dyeing Mach. Co., 457 F.2d 1377 (4th Cir. 1972). Stockham has never maintained any policy against or restriction on transfers, nor any educational requirement for transferees. Compare Griggs v. Duke Power Co., *supra*; Rodriguez v. East Texas Motor Freight, 505 F.2d 40 (5th Cir. 1974); Franks v. Bowman Transp. Co., *supra*; Johnson v. Goodyear Tire & Rubber Co., *supra*; United States v. Georgia Power Co., 474 F.2d 906 (5th Cir. 1973); Bing v. Roadway Express, Inc., 444 F.2d 687 (5th Cir. 1971); Quarles v. Philip Morris, Inc., *supra*. In addition there are no lines of progression and entry level jobs, so that an employee can transfer directly to any job vacancy within a seniority unit for which he is qualified. Compare Head v. Timken Roller Bearing Co., 486 F.2d 870 (6th Cir. 1973); United States v. Bethlehem Steel Corp., 446 F.2d 652 (2nd Cir. 1971); Quarles v. Philip Morris Inc., *supra*.

25. Because of the overriding considerations of basic job competency, where a company can establish the qualifications and skills required to perform successfully a particular job and the plaintiffs have failed to show an instance of a qualified black being denied the job, there has been no showing of racial discrimination in evaluating the abilities and capacities of hourly employees. Buckner v. Goodyear Tire & Rubber Co., *supra*. Stockham showed the qualifications, in the form of objective criteria applied to all workers alike, needed by individuals in order to perform safely and efficiently the craft and high skill jobs. Plaintiffs were unable to show a single instance of a qualified black who sought one of these jobs and was rejected while whites of equal or inferior qualifications obtained the job.

26. When considering the number of blacks in jobs which require special skills and abilities, the relevant figure for comparison purposes is the percentage of blacks in the local labor market who are qualified for such jobs. The relevant labor pool cannot be assumed to be the same as the general population where the jobs demand skills and training possessed by relatively few individuals. Hester v. Southern Ry., *supra*; McAdory v. Scientific Research Instruments, Inc., 355 F.Supp. 468 (D. Ind.1973); Castro v. Beecher, 334 F. Supp. 930 (D.Mass.1971); Dobbins v. Local 212 IBEW AFL–CIO, 292 F.Supp. 413 (S.D.Ohio 1968).

27. The relatively small number of blacks in certain high skilled and craft jobs at Stockham is due not to any discriminatory practices of Stockham, but due instead to the absence of qualified blacks. An employer is entitled to insist that his workers be qualified and as long as the qualifications, as in this case, are not artificial or established with an intent to discriminate, the employer is not required to place individuals of any race who lack such qualifications on the job. Plaintiffs have failed to establish racial stratification, through either initial job assignments or promotion and transfer decisions, in the job classification system at Stockham.

## E. SUPERVISORS

28. In order to rebut any inferences raised by statistics showing a relatively small number of blacks in supervisory positions, the defendant may show that selection is done on the basis of objective, job-related criteria. Watkins v. Scott Paper Co., 6 FEP 511 (S.D.Ala.1973); Turner v. Firestone Tire & Rubber Co., F.Supp., 4 FEP 639 (W.D.Tenn.1971). The lack of totally objective criteria is not *per se* a statutory violation or necessarily even evidence of any such violation. Swint v. Pullman-Standard, *supra*.

29. Selection of supervisors at Stockham is accomplished by the highest level management officials applying the most objective criteria possible. Since plaintiffs produced no testimony or other evidence to suggest that such criteria is not fairly applied, or that a qualified black was denied promotion to a supervisory position or that there were any instances when qualified black employees were "passed over" in favor of equally or less qualified whites, no violation of the Act has been proved. Compare Gilmore v. Kansas City Ry., 7 EPD ¶ 9338 (W.D.Mo.1974), with Pettway v. American Cast Iron Pipe Co., *supra* and United States v. N.L.Indus., Inc., 479 F. 2d 354 (8th Cir. 1973).

30. Furthermore, since there is a low turnover rate among supervisory personnel, and thus relatively few vacancies, the comparatively small number of blacks holding supervisor jobs, properly evaluated, does not establish discrimination in the selection of supervisors as a matter of law, especially in the absence of a showing of a single qualified black denied employment or promotion to a supervisory position. Swint v. Pullman-Standard, *supra*; Quarles v. Philip Morris, Inc., *supra*.

## F. CLERICAL, TIMEKEEPER, SALES AND GUARD JOBS

██ 31. The statistics introduced by plaintiffs in connection with clerical, timekeeper, sales and guard jobs failed to show a substantial adverse impact on black employees at Stockham, and are not sufficient to shift the burden of coming forward with evidence about the nature of such jobs to Stockham. Compare Franks v. Bowman Transp. Co., *supra*; United States v. N. L. Industries, Inc., *supra*.

32. Stockham has not excluded or limited, in any manner, blacks from entering these jobs, in light of the fact that Stockham has introduced evidence showing the special aptitudes and capabilities required of clerical employees and the qualifications required of persons hired in a salesman capacity; evidence showing that few vacancies existed in clerical positions; and evidence showing that although more whites filed timely applications, the successful application percentages for black and white applicants are substantially equal. Plaintiffs were unable to show a single qualified black who was denied any of these jobs. Compare United States v. N. L. Indus., Inc., *supra*.

## G. APPRENTICE TRAINING PROGRAM

██ 33. There has been no showing on the part of plaintiffs that the education and age guidelines produce a disproportionate impact on black applicants,[6] see Pettway v. American Cast Iron Pipe Co., *supra*; Barnett v. W. T. Grant Co., FEP 434 (W.D.N.C. 1974), as there is no significant difference between the percentage of black and white employees at Stockham possessing high school educations. Until a showing of disproportionate impact is made, Stockham is not required to demonstrate that the education and age requirements are job related. *Id.*

██ 34. This Court must evaluate the number of blacks entering the program after July 2, 1965 in light of the relative number of applications by blacks and whites. Buckner v. Goodyear Tire & Rubber Co., *supra* (number of blacks accepted was comparable to the application rate by blacks). Since plaintiffs failed to show any qualified black who was denied admission, the apprentice program, in both design and operation, does not discriminate against black employees.

## H. OTHER TRAINING PROGRAMS

██ 35. There has been no showing that either the Management Training Program or the Personnel Development Program discriminates against blacks in violation of Title VII.

## I. STOCKHAM'S EMPLOYMENT TESTING PRACTICES

36. Title VII of the Civil Rights Act of 1964, as amended, does not prohibit aptitude testing in employment; on the contrary, the Act expressly recognizes that job-related aptitude tests, properly selected and administered, assist an employer in making objective, non-discriminatory selection decisions. "[N]or shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin." 42 U.S.C.A. § 2000e–2(h).

██ 37. A nonvalidated employment aptitude test does not violate Title VII *per se*. An employment aptitude test is subject to challenge under Title VII once plaintiff makes a showing that the test subject to attack disproportionately disqualifies black employees or applicants. Griggs v. Duke Power Co., *supra*; Hester v. Southern Ry., 497 F.2d

---

6. The evidence clearly shows that the age and educational guidelines can be, and have been, waived for both blacks and whites, and that Stockham has allowed employees of both races to enter the program with advance standing when so qualified.

██

1374, 1381 (5th Cir. 1974); Davis v. Washington, 512 F.2d 956 (D.C.Cir. 1975); Equal Employment Opportunity Commission, "Guidelines on Employment Selection Procedures," 29 C.F.R. § 1607.-3.

38. A statistical showing of racially disproportionate impact of an employment test establishes the requisite "racial connection". Woods v. North American Rockwell Corp., 480 F.2d 644 (10th Cir. 1973).

39. The evidence of racially disproportionate impact of a particular employment test must be clear and convincing. Hester v. Southern Ry., supra; Watkins v. Scott Paper Co., 6 EPD ¶ 8912 at pp. 5872–73 (S.D.Ala. 1973). The Court must be certain that the administration of the challenged test, and not other factors, disproportionately disadvantages black applicants or employees.

40. Proof of racially disproportionate impact may consist of either direct evidence that blacks have scored poorer than whites on the challenged test (i. e., comparison of black and white pass-fail rates or mean scores) or circumstantial evidence that blacks have been disqualified in greater proportions than whites as a result of the challenged tests. Compare United States v. Georgia Power Co., supra at 912 n. 5, with Boston Chapter NAACP v. Beecher, 371 F.Supp. 507 (D.Mass.) aff'd 504 F.2d 1017 (1st Cir. 1974). See also Hester v. Southern Ry., supra; Douglas v. Hampton, 512 F.2d 976 (D.C.Cir. 1975).

41. Plaintiffs have not offered any competent evidence, direct or indirect that the Wonderlic test, as administered at Stockham in the period from 1965 through 1971, disqualified a disproportionate number of black applicants or employees. In the absence of evidence of a racially disproportionate impact, the defendant-employer was under no obligation to go forward and prove that the Wonderlic test, as administered during that period, was job-related. Griggs v. Duke Power Co., supra; Boston Chapter, NAACP v. Beecher, 504 F.2d 1017 (1st Cir. 1974).

42. With respect to the Tabaka test battery, which Stockham began utilizing in 1973, there is no evidence of any kind that those tests have disqualified any blacks from any position at Stockham, and thus no showing of adverse impact has been made.

43. In the absence of a showing of a racially disproportionate impact of the Tabaka the defendant-employer was not obligated to go forward with proof that the tests were job-related or validated. Although on the record in this case, the court is clearly not required to reach conclusions of law with respect to the study, it will do so in the interest of both a complete record and judicial economy. See, Watkins v. Scott Paper Co., supra.

44. The Equal Employment Opportunity Commission "Guidelines on Employment Selection Procedures," which deal with the technical requirements of test validation, are entitled to deference by this court although the Guidelines do not have the force of law. Griggs v. Duke Power Co., supra; United States v. Georgia Power Co., supra; United States v. Jacksonville Terminal Co., supra at 456.

45. The technical requirements of the Equal Employment Opportunity Commission Guidelines have been met by the validation study relating to the "Tabaka" Test; and the study was a professionally competent study conducted by a recognized expert.

46. The Court concludes as a matter of law that the specific methodology used in the study was professionally sound and reasonable; its reliability is unquestionable. In particular, the court's conclusions with respect to the study are (a) the law does not require that the results of a validation study be reported by the expert to his client in any particular form, (b) where technically feasible, the study accommodates

the hypotheses of differential validity and studies black employees separately from whites, (c) the job analysis employed appears to meet the Commission's Guidelines as to the success criteria selected, (d) the statistical techniques utilized in reaching the conclusions reflected by the validation study are professionally sound and, (e) the performance ratings obtained appear to be free from rater bias in all respects.

47. Stockham demonstrated the validity of the Tabaka tests, *i. e.*, "job-relatedness," to the extent that available data and sound professional judgment permitted. Further, the consultant's recommendation that Stockham continue to gather additional validation data does not deprive the present study of its usefulness; as a matter of law, Stockham is entitled to rely upon the present study as additional data is collected.

48. Title VII does not require that an employer freeze its selection techniques; an employer is free to adopt new and different selection techniques so long as those techniques do not themselves operate in a discriminatory fashion.

49. The Court rejects the mechanical application of the Equal Employment Opportunity Commission's Disparate Treatment Guideline, 29 C.F.R. § 1697.11, since that guideline is inconsistent with the plain language of the statute permitting utilization of job-related aptitude tests. 42 U.S.C.A. § 2000e–2(h). Further, the guideline does not accommodate changing technology, such as the record reflects in this case, or the adoption of lawfully validated tests which take into account the hypothesis of differential validity.

## J. THE UNION DEFENDANTS

50. Since this Court finds that there has been no violation of the Act, there is of course no liability on the part of the defendant unions. However, in the interest of judicial economy, this Court concludes that if liability existed, and since the contract between Stockham and the unions is the product of negotiation, the defendant unions would also be liable in their roles as bargaining agent in the collective bargaining process. See Rodriguez v. East Texas Motor Freight, *supra*; Johnson v. Goodyear Tire & Rubber Co., *supra*; United States v. United States Steel Corp., 371 F.Supp. 1045 (N.D.Ala.1973).

## K. FACILITIES

51. Injunctive relief as to facilities at Stockham is improper and unnecessary in this case. This Court recognizes the important role played by conciliation in Title VII enforcement. Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); EEOC v. U. S. Pipe and Foundry Co., 375 F.Supp. 237 (N.D.Ala.1974). Although no agreement was reached in the context of this case, Stockham and the EEOC were able to conciliate the facilities issue in the framework of another charge, and the facilities issue has been effectively resolved.

## L. BACK PAY

52. Section 706(g) of the Civil Rights Act of 1964 provides as follows:

"If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer . . . or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. . . ."

53. The award of back pay is an equitable remedy which may be

granted by the district court in its discretion and is not a damage remedy. Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir.), dismissed pursuant to Rule 60, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971). The decision to grant or deny back pay rests in the discretion of the federal district court which is empowered to fashion remedies in Title VII actions as "the equities of the particular case compel." LeBlanc v. Southern Bell Tel. and Tel. Co., 460 F.2d 1228, 1229 (5th Cir. 1972), cert. denied 409 U.S. 990, 93 S.Ct. 320, 34 L.Ed.2d 257 (1973).

■ 54. An award of back pay is not designed to punish a defendant who may have violated the Act, but rather is intended to restore those individuals wronged to their rightful economic status. United States v. Georgia Power Co., 474 F.2d 906 (5th Cir. 1973). Since the primary role of back pay is to provide compensation for tangible economic loss, the law requires that plaintiffs first establish that they have "sustained economic loss from a discriminatory employment practice." Pettway v. American Cast Iron Pipe Co., *supra,* at 252. See also Johnson v. Goodyear Tire & Rubber Co., *supra* (employees who have been victims of discrimination had directly caused "economic loss" and "financial deprivation" to black employees). As noted by the Fifth Circuit:

". . . Whether black workers were economically injured by unlawful discrimination and require a back pay award to make them whole is the issue."

Pettway v. American Cast Iron Pipe Co., *supra.* The record in this case is barren of any persuasive evidence of tangible economic loss with respect to the class. Furthermore, plaintiffs have not proved the existence of any discriminatory condition or practice at Stockham which would effect earnings and therefore be relevant to the award *vel non* of back

pay. Consequently, no back pay is awarded to plaintiffs and the class they represent.

## M. INJUNCTIVE RELIEF

■ 55. This Court concludes that plaintiffs are not entitled to injunctive or declaratory relief of any kind as they have failed to prove the allegations of their complaint.

## N. ATTORNEYS' FEES

■ 56. Having failed to prove a violation of Title VII and Section 1981 on all issues, with the possible exception of the "facilities" issue the plaintiffs are not entitled to recover attorneys' fees (apart from the facilities issue) and their request therefor is accordingly denied.

## JUDGMENT

Findings of Fact and Conclusions of Law having this day been made and entered in this action and filed concurrently herewith, it is hereby ORDERED, ADJUDGED, and DECREED by the Court, as follows:

(1) Judgment is hereby rendered in favor of each of the defendants, Stockham Valves & Fittings, Inc. (Stockham), United Steelworkers of America, and Local Union 3036, United Steelworkers of America, on all issues raised by plaintiffs, individually, and on behalf of the class heretofore defined by the Court; subject to the following:

(a) With regard to the issue of racially discriminatory facilities defendant Stockham is ordered to file with the Court within 15 days after the date of this judgment a written report specifically advising the Court the extent to which Stockham has carried out the obligations imposed upon Stockham by the conciliation agreement entered into between Stockham

and the Equal Employment Opportunity Commission heretofore made a part of the record herein as Stockham Exhibit 34.

(b) Although Stockham has not heretofore imposed its existing age and educational requirements as absolute barriers to applicants for the Stockham apprenticeship program, such existing requirements may not appropriately be imposed by Stockham in the future as an unconditional requirement for entry to members of the class who apply for such program and who possess qualifications at least equivalent to those for whom such age and educational requirements have heretofore been waived by Stockham and it is so ordered.

(2) Although the record reflects good faith efforts by Stockham to bring the Equal Employment Opportunity Commission to the conciliation table both before and after the lawsuit was filed, the filing of this lawsuit may have played a therapeutic role in bringing about the conciliation agreement between Stockham and the Equal Employment Opportunity Commission with regard to the subject of racially discriminatory facilities. Under the circumstances the Court is inclined to the view that plaintiffs are entitled to a reasonable attorneys' fee, because this action may have contributed to the resolution of the facilities issue; (the amount of such fee is, of course, subject to the limitation that, in all respects otherwise, plaintiffs are not "prevailing parties" in this litigation). It is so ordered.

(3) For purposes stated in paragraphs (1)(a) and (2) above, and for interpretative purposes, jurisdiction is hereby retained. In all other respects this action is hereby dismissed with prejudice.

(4) Each party shall bear its own costs and expenses, except as hereinabove ordered.